Charles E. STEELE, individually and as guardian of the estate of Charles E. Steele, Jr., Plaintiffs-Appellees,

v.

The HARTFORD FIRE INSURANCE COMPANY, Defendant-Appellant.

No. 85–2017.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1986.

Decided April 10, 1986.

As Amended April 11, 1986.

Rehearing Denied May 8, 1986.

John E. Cassidy, Jr., Cassidy & Mueller, Peoria, Ill., for defendant-appellant.

Steven M. Helm, Dukes, O'Rourke, Stewart, Martin & Helm, Ltd., Danville, Ill., for plaintiffs-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The common law of Illinois makes it a civil wrong for a liability insurer to refuse, in bad faith, to settle litigation against the insured, thereby exposing the insured to a judgment in excess of the policy limits. See, e.g., *Scroggins v. Allstate Insurance Co.*, 74 Ill.App.3d 1027, 1029–30, 30 Ill.Dec. 682, 684–85, 393 N.E.2d 718, 720–21 (1979); *Phelan v. State Farm Mutual Automobile Ins. Co.*, 114 Ill. App.3d 96, 102-03, 69 Ill.Dec. 861, 864–65, 448 N.E.2d 579, 582–83 (1983); see generally 7C Appleman, Insurance Law and Practice § 4711 (Berdal ed. 1979). We must consider the meaning of "bad faith" in the factual setting of this case.

The story begins with a lawnmower accident in 1974 to Charles E. Steele, Jr., who was five years old at the time. His grandfather, Hershel Bauman, was using a mower manufactured by Artic Enterprises Inc. to cut the grass at the home of Harry Tjardes, a neighbor, who paid Bauman for this service. Charles was riding on the back of the mower. He fell off, and Bauman accidentally backed the mower over Charles's foot; the resulting injury was so serious that the foot had to be amputated. Bauman and his wife had a homeowners' policy, issued by the Hartford Fire Insurance Company, which provided liability coverage of $25,000 for bodily injury. The policy provided, "This Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of this Company's liability has been exhausted by payment of judgments or settlements."

The Hartford offered Charles's father $25,000, the full policy limits, in exchange for a general release of liability. The settlement had to be approved by an Illinois court, which appointed James Walker as the boy's guardian *ad litem* and then on Walker's recommendation rejected the set-

tlement. By giving a general release, Walker would have given up the right to sue on Charles's behalf both Harry Tjardes—the owner of the property on which the accident had occurred and therefore arguably the employer *pro tem.* of Bauman and if so liable for Bauman's negligence under the principle of respondeat superior—and Artic Enterprises, which would be liable on the ground of products liability if the lawnmower had been defective or unreasonably dangerous.

The settlement having fallen through, the Hartford hired a local lawyer, Guy Fraker, to defend against Charles's claim. Walker wrote Fraker offering to settle with the Hartford for $25,000 plus a covenant not to sue Bauman, explaining, "The nature of the injury makes it clear that [if the claim were prosecuted to a jury verdict] the verdict would exceed the policy coverage of $25,000 and thus create a judgment against Mr. Bauman in excess of the insurance coverage. However, it is not the desire of the guardian to invade the personal assets of Mr. Bauman if the claim can be promptly settled for the amount of insurance coverage...." Upon receipt of this letter Fraker wrote the Baumans to explain the situation, and in particular that if they settled for just a covenant not to sue rather than a general release, "There is a real possibility that either of these parties [Tjardes and Artic] would turn around and sue you, seeking indemnity." He added, "This is a fairly complex problem and one which I would strongly urge you to discuss with your own personal attorney of your choice."

The Baumans replied that they had no personal attorney and wanted to discuss the matter with Fraker. They met at Fraker's office for more than an hour and he explained to them with the aid of a diagram the difference between a general release and a covenant not to sue. Fraker testified that at the end of the conference the Baumans told him "that this thing had been a real tragedy for them. They wanted the injured party to have the money, but they also wanted this to be at an end, and they did not wish to have continued exposure on

their own part to a lawsuit." Fraker wrote a confirmatory letter to the Baumans, summarizing the conference in some detail. Again he explained that if Walker refused to give a general release, "This would leave them [i.e., the Steeles and Walker] in a position where they could make claim against either the manufacturer of the lawn mower or the owner of the property. There is a distinct possibility then that either of these parties would sue you and seek indemnity from you. If the Hartford pays the $25,000.00 and does not obtain a Release, your personal assets would then be exposed out over by either of these parties.... You indicated to me that as far as you were concerned you did not want the Hartford to settle the case and pay the policy limits unless they could obtain a Release, fully clearing you of further potential liability."

Walker remained adamant in his refusal to settle the case with the Hartford in exchange for a general release and in 1976 he brought a suit in state court on Charles's behalf against Bauman, Tjardes, and Artic. The Hartford retained Fraker to defend the claim against Bauman. Tjardes moved unsuccessfully to obtain summary judgment on Walker's claim against him, but then agreed with Fraker to waive any right to seek indemnity from Bauman in the event that Walker obtained a judgment against Tjardes, provided that Fraker settled Walker's claim against Bauman. Apparently Tjardes's lawyer thought that a settlement of Walker's claim against Bauman would operate as a release of Walker's claim against Tjardes as well. Armed with this agreement, and knowing that under Illinois law as it then stood a manufacturer sued for products liability could not get indemnity from a joint tortfeasor (though the law was in flux, and the risk of such an action could not be entirely discounted), Fraker now offered to settle the suit against Bauman for the policy limits plus a covenant not to sue. Before Walker responded to this offer the Illinois Supreme Court changed its mind about indemnity, see *Skinner v. Reed-Prentice Di-*

*vision Package Machinery Co.,* 70 Ill.2d 1, 15 Ill.Dec. 829, 374 N.E.2d 437 (1977), and Artic promptly filed a third-party claim against Bauman for indemnity of any damages that it might be ordered to pay in Walker's suit. Fraker thereupon withdrew the offer to Walker, and this removed the premise of the deal with Tjardes. A few weeks later the Illinois Supreme Court decided not to apply its new rule on indemnity to pending cases. See *id.* at 16–17, 15 Ill.Dec. at 836, 374 N.E.2d at 444 (1978).

Settlement efforts having failed, Walker's case against the three defendants proceeded to trial. At the start of the trial Walker offered to settle with Tjardes for $25,000 plus an agreement not to seek indemnity against Bauman. This offer was consistent with Walker's earlier assurance to Fraker that he would not seek to collect a judgment out of Bauman's personal assets. The record contains no evidence of what those assets might be; the district judge's statement that Bauman was "impecunious" has no basis in the record.

Tjardes now counteroffered $10,000 (and the covenant), but Walker refused. Walker settled with Artic for $25,000. Fraker then offered to pay the full policy limits in exchange for just a covenant not to sue Bauman, but Walker refused; the offer, he said, had come too late. The case came on for trial against Tjardes and Bauman. The trial judge granted a directed verdict for Tjardes. The jury brought in a verdict against Bauman of $135,000 for Charles and $30,000 for his father. The Hartford paid $25,000, the policy limits, in partial satisfaction of the judgment.

█ Walker brought a supplementary proceeding against Bauman to collect the unpaid balance of the judgment. That proceeding was settled by Bauman's assigning to the Steeles his right to sue the Hartford for bad faith. The Steeles then brought this suit against the Hartford, which removed the case to federal district court. The basis of federal jurisdiction was diversity of citizenship. There is no suggestion that the assignment was made in order to confer diversity jurisdiction. If that had been the purpose, the district court might have lost jurisdiction over the case by virtue of 28 U.S.C. § 1359 (improper or collusive efforts, by assignment or otherwise, to confer federal jurisdiction). We say "might" rather than "would" because it is an unsettled question whether an assignment, if bona fide in the sense that there is a real and not merely nominal or sham transfer of the assignor's interest in the claim, can trigger section 1359 merely because the motive is to confer federal jurisdiction. See 14 Wright, Miller & Cooper, Federal Practice and Procedure § 3639, at pp. 114–16 (2d ed.1985). If otherwise valid, the assignment will not run afoul of the statute merely because its effect is to confer federal jurisdiction. See *Bailey v. Prudence Mutual Casualty Co.,* 429 F.2d 1388, 1389–90 (7th Cir.1970). Presumably the same conclusion would be reached if the assignment, though legitimate under state law and supported both by adequate consideration and reasons unrelated to a desire to get into federal court (what those reasons might be, in the case of assignments of excess-judgment claims, are discussed in *Moutsopoulos v. American Mutual Ins. Co.,* 607 F.2d 1185, 1189–90 (7th Cir.1979)), was also intended to create federal jurisdiction. In such a case, where the assignment probably would have been made even without a jurisdictional motive, the danger that the federal courts might be flooded with suits by assignees would be too remote to justify the bother and uncertainty of digging for a buried jurisdictional motive. But if getting into federal court was the sole purpose of the assignment, then even if the assignment was supported by consideration and was lawful under state law, one could question in just what sense the assignment was bona fide, and, more to the point, could ask whether it is not the precise purpose of section 1359 to discourage people from using the device of assignment to get access to the federal courts.

█ The present case, however, is not the right case for resolving this interesting question, and not only because the defend-

ant rather than the plaintiffs sought to invoke federal jurisdiction. Beyond that the statute can have no application where the assignor could have sued in federal court as well as the assignee, and that is the situation here. Although the Hartford's petition to remove the case to federal court does not allege the state of citizenship of the Baumans, it is apparent from the record that they, like the Steeles, are citizens of Illinois. The Hartford is a citizen of Connecticut, and Connecticut alone, since it is both incorporated there and has its principal place of business there. See 28 U.S.C. § 1332(c). Hence there would have been diversity of citizenship even if the Baumans had not assigned their claim to the Steeles but had sued the Hartford directly.

After a three-day bench trial, the district judge awarded judgment for the Steeles in the amount of the excess judgment against Bauman, and the Hartford has appealed.

We may assume without having to decide that whether the insurance company acted in bad faith in not advising the Baumans to settle Walker's claim for the policy limits plus a covenant not to sue is a question of fact within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure. The cases assume this without discussion. See, e.g., *Bailey v. Prudence Mutual Casualty Co., supra,* 429 F.2d at 1390. The issue of bad faith is similar in character to that of negligence, especially since, as we are about to see, negligence may be deemed bad faith in a refusal-to-settle case such as this. These "mixed questions of law and fact" as they are sometimes called—it would be more informative to describe them as questions of the application of law to fact—sometimes are reviewed under the clearly-erroneous standard applicable to questions classified as factual, sometimes receive plenary appellate review like pure issues of law, and sometimes are reviewed under an intermediate standard. See *Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925, 937 (7th Cir.1984) (concurring opinion). The standard most favorable to the appellees would of course be the clearly-errone-ous standard, and as the appellant doesn't challenge it we shall apply it.

■ But this does not carry the day for the appellees. We think the district court's determination that Fraker and the Hartford were guilty of bad faith was clearly erroneous, for our review of the record leaves us with a strong conviction that the insurance company acted throughout in perfectly good faith. The company incurred significant expenses (Fraker's fees) in an effort to protect its insured from an excess judgment, and it kept the insured fully advised of its strategy all the way.

The company, acting as it was required to do as the perfectly loyal and reasonably intelligent agent of its insured, had to balance two risks. The first was that if it held out for a general release Walker would refuse to settle, would go on to victory in the courtroom, would obtain a judgment in excess of the policy limits, and would then levy on Bauman's personal assets. This risk was not great. Because the Baumans were Mrs. Steele's parents and Charles's grandparents, the Steeles did not want to levy on Mr. Bauman's personal assets; and although Charles's suit was not in the control of the Steeles, the guardian *ad litem,* Walker, had assured Fraker that he would not levy against the Baumans. There is no suggestion that Bauman is a man of wealth (the low policy limits suggest he is not); and it is hardly likely that Mrs. Steele, imitating King Lear's bad daughters, would turn Charles's grandparents out of their home in order to satisfy a judgment in excess of the policy limits. Fraker could therefore reasonably believe that Walker would not press the matter to a trial against Bauman. A somewhat greater danger was that Walker would obtain damages against Tjardes and Artic, one or both of whom would turn around and seek indemnity against Bauman; no family relationship would inhibit either of them from trying to collect a judgment out of Bauman's personal assets. This risk may have been rather slight also. Bauman might not have sufficient liquid assets to be worth suing, and anyway

Walker's claim against Tjardes was tenuous, depending as it did on successfully characterizing Bauman as an employee rather than independent contractor of Tjardes. Since, as it turned out, Bauman had supplied the mower and Tjardes had not supervised Bauman's mowing, the latter characterization was by far the more plausible. See, e.g., *Cable v. Perkins*, 121 Ill.App.3d 127, 76 Ill.Dec. 638, 459 N.E.2d 275 (1984); *Kuberski v. Noonan*, 23 Ill. App.3d 237, 318 N.E.2d 677 (1974). Finally, Artic, except for a brief interval during the settlement negotiations, seemed not to have a legal right to indemnity.

■ The weakness of Walker's claim against Tjardes is a two-edged sword. It reduced the threat of a third-party claim against Bauman but increased the likelihood that Walker would in the end agree to give Bauman a general release. An additional reason why Walker might ultimately yield on the issue of the release would be the Steeles' desire not to collect a judgment out of Bauman's personal assets. They would be doing this indirectly if they got judgments against Tjardes and Artic, either of whom turned around and got a judgment for indemnity against Bauman; and Fraker could reasonably believe that an awareness of this possibility might influence Walker in negotiating the issue of the general release, though in the end it did not. Moreover, weak as it appears to have been, Walker's claim against Tjardes was strong enough to induce Tjardes (actually his insurance company) to offer $10,000 to settle it. If the offer had been accepted Tjardes could have turned around and sued Bauman for indemnity, which is conventionally available where an employer is held liable for his employee's tort under the doctrine of respondeat superior (the ground for the action against Tjardes). See *Stawasz v. Aetna Ins. Co.*, 99 Ill.App.2d 131, 240 N.E.2d 702 (1968); *Embree v. Gormley*, 49 Ill.App.2d 85, 199 N.E.2d 250 (1964); Prosser and Keeton on the Law of Torts § 51, at p. 341 and n. 6 (5th ed.1984). Though not wealthy, Bauman might be good for $10,000, or a sufficient fraction of that amount to make suit worthwhile. Evidently Artic, which did sue Bauman, thought so. To prevent the risk of an indemnity action from materializing, Fraker wanted to hold out for a general release from Walker; but the problem was that by giving it to him Walker would be giving up a chance to get some additional damages, from Tjardes or Artic or both.

Fraker's best strategy might have been to work out a three-cornered arrangement among himself, Walker, and Tjardes, whereby both Walker and Tjardes would agree not to sue Bauman; and to take his chances with Artic. But in fact he tried this approach. By November 1977 the elements of such a deal were in hand, but it fell apart the next month when the risk materialized. Later, when Fraker tried to resurrect the deal, Tjardes balked at the amount demanded by Walker; and by the time Artic had fallen out of the picture again, Walker was no longer willing to settle the case on his original terms.

The fact that Fraker let the reins slip from his hands would not establish bad faith in any common meaning of the term. Nevertheless there is authority in Illinois for extending the term to include a negligent failure to settle within the policy limits; see in particular *Browning v. Heritage Ins. Co.*, 33 Ill.App.3d 943, 947, 338 N.E.2d 912, 916 (1975). The idea behind this extension (an idea nowhere expressed, and just a guess on our part) may be that the insurance policy implicitly commits the insurer to use due care to protect the insured from an excess judgment. Why an insurer should be thought voluntarily to assume a duty whose faithful fulfillment can only encourage people to underinsure is not clear to us. Generally it has been thought that more than simple negligence is required. See, e.g., *Voccio v. Reliance Insurance Cos.*, 703 F.2d 1, 2 (1st Cir.1983). In the absence of any holding by the Illinois Supreme Court, and any explanation in the decisions of the lower courts of Illinois, we are entitled to doubt that simple negligence is enough under Illinois law—though that court assumed it was enough in *Smiley v. Manchester Insurance & Indemnity*

*Co.*, 71 Ill.2d 306, 313–15, 16 Ill.Dec. 487, 490–91, 375 N.E.2d 118, 121–22 (1978). But we need not resolve our doubts; we can assume without having to decide that negligence is enough; for we do not think that a reasonable factfinder could deem Fraker's representation even negligent, let alone in bad faith in some stronger sense. Mistake is not negligence; the duty of good faith does not make the insurance company an insurer against the uncertainties inherent in the settlement process. Indeed, "mistake" may be the wrong word. The proper perspective for judging Fraker is ex ante (before the fact) rather than ex post. If Fraker chose the correct course on the basis of what he knew, he should not be called mistaken because of unavoidable uncertainty about whether the course would succeed.

Fraker demonstrated good faith in the ordinary sense of these words by protecting the insured's interests at the expense of the insurance company's. If he had gotten Bauman to settle on the terms originally offered by Walker, the insurance company would have been off the hook; the policy allowed it to walk away as soon as it settled for the full policy limits. Instead it hung around (in the person of its agent, Fraker), vainly trying to defend Bauman against an excess judgment—vainly trying to obtain a release from Tjardes—and incurred legal expenses in these endeavors. We do not suggest that this was altruism, for we know what would have happened if the company had settled on Walker's original terms. If and when Tjardes and Artic filed claims for indemnity against Bauman (Artic actually did file such a claim, as we said), Bauman would have accused the insurance company of having settled prematurely with Walker in order to avoid the expense of defending the third-party claims. It seems, then, that whatever Fraker did he would be exposing the Hartford to a claim of bad faith. It cannot be the law that every excess judgment must be paid by the insurance company, so that in effect liability insurance policies have no limits. Such a strange result would not even help policyholders in the long run; insurance companies would have to charge much higher prices, especially for policies with low limits.

■ The principal evidence of bad faith on which the district court relied was, first, the Baumans' deposition testimony that they didn't understand the complex legal fix they were in, and, second, a letter Fraker wrote the Hartford early on explaining what he conceived to be a potential conflict of interest between the Baumans and the Hartford. The first piece of evidence is of very slight relevance. The duty to represent the insured in good faith includes a duty to explain clearly and simply the legal choices facing the insured; it is not an absolute duty to enlighten where enlightenment may be impossible because of the insured's refusal to listen or his incapacity to understand the most patient and lucid explanation. Uncontradicted evidence consisting of Fraker's letters and diagram shows that he explained the legal situation to the Baumans with great care. If they didn't understand, it was not his fault. He advised them to consult their own lawyer, and they refused. He couldn't make them, and is not chargeable with their misunderstanding. His letters to them are in fact models of how to explain law to laymen. Although he can be criticized for having exaggerated the danger of a suit for indemnity by Artic as Illinois law then stood, in fact he was prophetic, for Illinois law changed in the course of the litigation. Only the fact that the Illinois Supreme Court decided to make the change prospective spared the Baumans the acute danger of being forced to indemnify Artic (unless Walker gave Bauman a general release) as Fraker feared.

■ Fraker's letter to the insurance company is the "smoking gun." But it is smoke without fire. The letter said:

> The question is, of course, do we have to take less than a full release in order to remain in good faith to our insured. There are two reasons we would want to obtain a full release. One is consistent with the interest of our insured, one is

not. There is the obvious possibility here of third party action. In the event there is an action against other potential defendants, this would expose the personal assets of the insured to such an action. Here, our interests are consistent. The other is that it would expose the Hartford to costs of defense which The Hartford should be concerned about, but the insured should not be and accordingly, the conflict. To refuse this settlement for the latter reason would be bad faith. If the policy had required the Hartford to bear all legal expenses arising out of an insured event, the dilemma identified by Fraker would have been a real one. But the policy states in language that could not be clearer that once the Hartford paid the full policy limits in settlement of a claim against the insured it would have no further obligation to defend him. The Steeles argue that maybe the term "settlement" as used in the insurance policy excludes a covenant not to sue, but that is nonsense. A covenant not to sue is a common form of settlement, see, e.g., *Dial v. City of O'Fallon*, 81 Ill.2d 548, 551, 44 Ill.Dec. 248, 250, 411 N.E.2d 217, 219 (1980); *Rogers v. Robson, Masters, Ryan, Brumund & Belom*, 81 Ill.2d 201, 203, 40 Ill.Dec. 816, 817, 407 N.E.2d 47, 48 (1980); *Perez v. Espinoza*, 137 Ill.App.3d 762, 763, 92 Ill.Dec. 377, 378, 484 N.E.2d 1232, 1233 (1985), and is certainly within the contemplation as well as literal terms of the policy. It is apparent that Fraker was not familiar with the policy; more surprising is why no one at the Hartford straightened him out.

Even if there was no actual conflict of interest between the Baumans and the Hartford—no way in which the Hartford could have been made worse off by settling with Walker in exchange for a covenant not to sue Bauman rather than a general release—if Fraker, mistakenly thinking there was a conflict, had tried to push the Baumans to hold out for a general release, he and therefore his principal would have been guilty of bad faith. But there is no evidence of that either. He advised them to get their own lawyer. He told the Baumans as accurately as he could what he perceived the tradeoffs to be between the alternative courses of action. True, he did not tell them that the median jury verdict for the loss of a foot was $175,000, but this was not a material omission. The Baumans knew they faced the risk of an excess judgment and faced it either way—in a suit by the Steeles and in an indemnity action by Tjardes and (less probably) Artic. If the Steeles got a $175,000 judgment against Bauman he would be personally liable for $150,000 (the difference between the judgment and the policy limits). If they got a judgment for $150,000 against Tjardes ($175,000 minus the amount that they would have received from his joint tortfeasor, Bauman, by virtue of the insurance policy), Tjardes would have a claim for $150,000 against Bauman. Although the Steeles were likelier to win a judgment against Bauman than against Tjardes because Tjardes's liability was more doubtful than Bauman's, Tjardes was likelier actually to levy on Bauman's assets than the Steeles were, so that the choice of which risk the Baumans should run was a close one. These risks came from the fact that the Baumans had bought a policy with such low limits. Maybe they could afford no more; but it was not the Hartford's fault that they faced an inescapable dilemma. Fraker laid out the relevant considerations to the Baumans as clearly as it was possible to do and they made their choice. The Steeles say that Fraker should have advised the Baumans of his imagined conflict of interest. But if he had told them, erroneously, that the insurance company would be better off holding out for a general release, this would not, so far as appears, have altered their decision—a decision motivated by their perception of their own self-interest.

■ Fraker's mistake, even if negligent in some sense—even if a breach of ethical duty to the Baumans, whose lawyer he was as well as the Hartford's—cannot impose liability on the Hartford, because the mistake did not cause him to subordinate the Baumans' interests to that of the Hartford. The only relevant bad faith is that which

causes the insurance company to act otherwise than it would do if acting in perfect good faith. Without proof of causation, there can be no recovery of damages. *Voccio v. Reliance Ins. Cos., supra,* 703 F.2d at 3–4. Fraker only had to give the Baumans' interests equal weight; for whatever reason he gave these interests paramount weight. To press for a general release could only help the Baumans, since (unlike the otherwise somewhat similar case of *Stoner v. State Farm Mutual Automobile Ins. Co.,* 780 F.2d 1414, 1418–19 (8th Cir. 1986)) the Hartford would have been off the hook by settling for the full policy limits in exchange merely for a covenant not to sue. The policy expense to the Hartford would have been the same, its legal expense (Fraker's fees) lower. Maybe Fraker pressed as hard as he did for the release because he mistakenly thought it would benefit the Hartford as well as the Baumans, but the only thing that matters is that he followed a course of action objectively consistent only with his giving primacy to the insured's interest. The insurance company cannot be punished just because its lawyer exceeded the call of duty to the insured. The law does not punish one for doing the right thing for the wrong reason.

Granted, Fraker did not inquire into the strength of the Steeles' case against Tjardes, which was material to the menace of a suit by Tjardes against Bauman for indemnity. But this omission was not the basis of the district court's decision, and does not by itself create liability. For there is (once again) no suggestion that the investigation would have altered Fraker's advice. We know the claim against Tjardes had some colorable merit because Tjardes offered $10,000 in settlement and the Steeles refused, evidently thinking they could do better at trial, though in the event they did worse. Had they accepted the settlement or won at trial Tjardes would probably have sought indemnity from Bauman. Fraker was not unreasonable to think this a greater threat than the threat (which never materialized) of the Steeles' collecting a judgment against Bauman after assuring him (via Walker's letter) that they would not do so.

We note finally the anomaly of the district court's awarding the Steeles more than $100,000 when there is no evidence that they would or could have collected any of this money from Bauman. The potential harm to the Baumans from the alleged bad faith of the insurance company came from exposing Mr. Bauman to a judgment in excess of the policy limits. But that could hurt the Baumans only to the extent that the excess was collected out of his assets. Suppose he had no assets, present or prospective (the significance of this qualification will become apparent in a moment). Then the Baumans were not damaged at all and the damage claim they assigned to the Steeles should have been worth nothing. Or suppose they had assets, but, consistently with Walker's assurance, the Steeles would not have tried to levy on them (apparently all the Steeles wanted from the Baumans was the assignment of this cause of action); again it would be impossible to see how the Baumans had lost $140,000 ($135,000 + $30,000 − $25,000) because of the excess judgment. It is true that Illinois is usually classed with those states which hold that an insured can recover an excess judgment caused by the insurer's failure to settle the litigation in good faith even without proof that the insured would or could have paid the judgment. See Annot., 63 A.L.R.3d 627, 641 (1975), citing *Wolfberg v. Prudence Mutual Casualty Co.,* 98 Ill.App.2d 190, 240 N.E.2d 176 (1968). Actually the picture is more complicated. *Wolfberg* holds only that the fact of having a judgment entered against you causes harm, even if the judgment is not collected. The court in *Wolfberg* may have been concerned that the judgment might make it harder for the insured to borrow money, though the court didn't say so. A later case adds that it is always possible that the insured might acquire some assets, or be discovered to have had them all the time, before the statute of limitations governing suits on judgments ran out—in which even he would have to pony up. *Smiley v. Manchester Ins. & Indemnity*

**450**

Co., 13 Ill.App.3d 809, 814, 301 N.E.2d 19, 22 (1973). A case distinguished in *Wolfberg*, however, *Childress v. State Farm Mutual Automobile Ins. Co.*, 97 Ill.App.2d 112, 119–20, 239 N.E.2d 492, 496 (1968), had held that an insured who was contractually protected against execution of the excess judgment could not obtain damages, and zero assets could be as good a protection as a contract. The Illinois Supreme Court has not spoken to the issue.

■ The path of reconciling *Wolfberg to Childress* lies in recasting the issue as one of amount of damages. The fact that an excess judgment cannot be fully executed does not excuse the insurer from liability or show that the insured has incurred no damages at all, because even an unexecuted judgment can cause an injury, present or future, that can be monetized. But the damages need not be exactly equal to the amount of the excess judgment; they could be more or less. Cf. *Elas v. State Farm Mutual Automobile Ins. Co.*, 39 Ill.App.3d 944, 949, 352 N.E.2d 60, 64 (1976). Here it seems plain that they were less—maybe zero (which if true is further evidence that Fraker had the Baumans' best interests at heart). Since the insurance company has not argued the point we do not rely on it but merely note it for future reference. We rest our decision entirely on the absence of evidence that the insurance company represented Bauman in bad faith.

The judgment is reversed with directions to dismiss the complaint.

· REVERSED.