Milton A. LEVENFELD, et al., Plaintiffs,

v.

Stanford CLINTON, Sr., et al., Defendants.

CONTINENTAL CASUALTY COMPANY and Evanston Insurance Company, Plaintiffs–Intervenors,

v.

Milton A. LEVENFELD, et al., Defendants.

No. 83 C 3677.

United States District Court, N.D. Illinois E.D.

Nov. 24, 1987.

Julian C. Campbell, Hinshaw Culbertson Moelmann Hoban & Fuller, Chicago, Ill., for Continental Cas. Co.

Don W. Fowler, Lord, Bissell & Brook, Chicago, Ill., for Evanston Ins. Co.

Lionel G. Gross, Altheimer & Gray, Chicago, Ill., for plaintiffs/defendants to intervening complaint.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Continental Casualty Company ("CNA") and Evanston Insurance Company ("Evanston") (collectively "Intervenors") have moved to intervene as plaintiffs in the underlying suit by a group of attorneys[1] against their former clients, Stanford Clinton, Sr. ("Clinton") and related persons and entities (collectively, with Clinton, "Clinton Defendants"). Intervenors are professional liability insurers for plaintiffs. Their Intervening Complaint seeks (1) declaratory relief that a proposed settlement between Intervenors and Clinton was entered into in "good faith" (a term of art, as further discussion will reveal) and (2) dismissal of the current plaintiffs from this litigation, substituting Intervenors in their stead. If such dismissal and substitution were granted, Intervenors would then settle with Clinton. Plaintiffs object to that proposed settlement and disposition.

For the reasons discussed in this opinion, the motion to intervene is granted, Intervenors' proposed settlement is declared not to be in "good faith" and plaintiffs are not dismissed out. It remains to be seen what effect the prior Intervenors–Clinton settlement negotiations will have on this action.

### Background

Plaintiffs sued Clinton to recover fees allegedly due for legal services they performed between 1966 and 1980 (the "fee claim"). Clinton counterclaimed, alleging malpractice. Plaintiffs tendered defense of the counterclaim, as well as defense of similar claims brought by Clinton's wife in the Cayman Islands, to Intervenors and other insurers. Plaintiffs also sought to have their insurers pay for the cost of prosecuting the fee claim.

Both CNA and Evanston maintained they were not responsible either for defending against or paying Clinton's claims or for prosecuting the fee claim. That coverage dispute was resolved by a November 5, 1985 agreement (the "Settlement Agreement"),[2] which provided:

1. CNA would pay expenses already incurred in prosecuting the fee claim and would treat all future expenses in this action as related to the counterclaim (¶ III.5).

2. CNA waived its reservation of defenses to coverage for both the counterclaim and the Cayman Islands suit (¶ III. 8) and agreed to pay "all sums reasonably necessary to settle the presently pending underlying damage litigation without additional contribution from" plaintiffs (¶ III.3a).

3. Plaintiffs authorized CNA to settle the counterclaim and the Cayman Islands suit (¶ III.3b).

4. Plaintiffs granted CNA "the right to dismiss, without compensation to the insureds, the insureds' fee claim or to otherwise employ the fee claim as an offset or credit to the claims asserted in the presently pending underlying damage litigation" (id.).

5. Both plaintiffs and CNA agreed to act in good faith to resolve the pending disputes. "Good faith" was defined as compelling "each party to act fairly and honestly as it would desire the other

---

**1.** Just as nothing else in this litigation is simple, the text statement has oversimplified the positions of the lawyer parties to the litigation. Plaintiffs are some of the former partners in the firm of Levenfeld & Kanter, which was dissolved in 1980. This action was brought by the so-called "Levenfeld group" to recover fees from Clinton. Other former members of Levenfeld & Kanter, who did not join in the lawsuit for fees, are involuntary plaintiffs and additional defendants to this action. They have taken no position on either the motion to intervene or the relief sought by Intervenors. All further references to "plaintiffs" speak only of the Levenfeld group.

**2.** All references to the Settlement Agreement (Int.Mem.Ex. E) will take the form "¶ —."

party to act if their positions were reversed" (¶ I.7).[3]

At the same time, CNA and Evanston settled their own dispute as to coverage by agreeing to share equally in the costs of defense and settlement of the counterclaim and Cayman Islands suits.

This litigation has been enormously expensive. Intervenors say they have spent about $800,000 to date and fear additional expenses exceeding $1 million. Clinton says his legal expenses have already reached $1.3 million. Motivated by a desire to stop the bleeding, Intervenors exercised their right under the Settlement Agreement to negotiate a settlement directly with Clinton in late December 1986 or early 1987.[4] Under that settlement Intervenors would have paid Clinton $500,000 and would have dismissed the fee claim in exchange for a general release. Clinton committed himself to delivering releases from Clinton Defendants, as well as his own.

That agreement has triggered the current dispute. Plaintiffs objected to dismissing the fee claim, because Clinton would remain free to bring disciplinary charges before the Illinois Attorney Registration and Disciplinary Commission ("ARDC"). That objection delayed formal settlement for several months, until plaintiffs withdrew their request for some form of protection against an ARDC charge. At that point, however, settlement had become impossible because Clinton had changed his position. Instead of delivering a general release as he had previously agreed, Clinton now wanted to reserve the right to assert claims for malicious prosecution and abuse of process against plaintiffs.[5] Intervenors have agreed to that change (with an exception to protect themselves), but plaintiffs understandably balk.

### Intervention

■ Fed.R.Civ.P. ("Rule") 24 allows a party to intervene as a matter of right when:

he claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest.

Intervenors claim the Settlement Agreement has given them a contract right to assert (or not to assert) plaintiffs' cause of action against Clinton. Their interest is in settling this action, and they are unable to do so without plaintiffs' cooperation.

While Intervenors' interest is thus opposed to plaintiffs' and while there is no diversity as between those parties, the presence of a nondiverse (and nonindispensable) intervenor does not destroy diversity (*American National Bank and Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 582 (7th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985)). Accordingly the motion to intervene is granted.

### *Contentions of the Parties*

Intervenors say:

1. They have the right under the Settlement Agreement to dismiss the fee claim in order to settle the counterclaim and Cayman Islands disputes. Because that is what they seek to do and because plaintiffs are blocking that course of action, plaintiffs are breaching their obligation to cooperate with Intervenors.

2. Any future malicious prosecution claim is clearly not a covered claim under the insurance policies. Intervenors therefore have no duty to indemnify, defend or settle those claims. Yet requiring Intervenors to obtain a release for those claims will force them to pay more to settle the claims they *are* duty-bound to cover.

For their part, plaintiffs respond:

1. Any claim of malicious prosecution will necessarily involve proof of the same

---

**3.** In addition to the provisions summarized in the text, the Settlement Agreement also resolved coverage disputes over two unrelated claims against plaintiffs.

**4.** There is a dispute as to whether there was an enforceable agreement at that point. This opinion later discusses that issue.

**5.** See Appendix as to the striking of Clinton's unsolicited affidavit on that subject.

facts as those underlying this action. That being true, the proposed settlement impermissibly shifts Intervenors' duty to defend—under both the policies and the Settlement Agreement—to plaintiffs.

2. Taken as a whole, the proposed Intervenors–Clinton settlement so prejudices plaintiffs' interests as a practical matter that it cannot satisfy the Settlement Agreement's standard of good faith.

3. Plaintiffs are third-party beneficiaries of the original Intervenors–Clinton settlement agreement, which included a general release. Intervenors and Clinton should not be allowed to amend their agreement to plaintiffs' detriment.

### Intervenors' "Good Faith"

■ This dispute is necessarily governed by the terms of the Settlement Agreement. As already stated:

1. It authorizes Intervenors to dismiss or compromise plaintiffs' fee claim to effect a settlement of Clinton's claims against plaintiffs.

2. Plaintiffs are required to cooperate in Intervenors' efforts to settle.

3. Most important for the current inquiry, both parties are required to act in good faith.

Illinois law reads an implied obligation of good faith into all insurance contracts. Every insurer must give its insured's interest at least equal weight to its own when considering whether to accept a settlement (*Scroggins v. Allstate Insurance Co.*, 74 Ill.App.3d 1027, 1029, 30 Ill.Dec. 682, 684, 393 N.E.2d 718, 720 (1st Dist.1979)). At the very least, "an insurer ... ought not to be permitted to use the exclusive control of settlement and defense as an instrument of injury to its assured" (*Yelm v. Country Mutual Insurance Co.*, 123 Ill.App.2d 401, 404, 259 N.E.2d 83, 84 (3d Dist.1970)). But here the parties have chosen to frame that obligation as an expression of the Golden Rule—in words that bear repeating (¶ I.7):

The phrase *good faith* shall compel each party to act fairly and honestly as it would desire the other party to act if their positions were reversed.

In light of that selfless fiduciary standard (plainly more demanding than the mere absence of bad faith), case law defining the implied obligation of good faith can provide only illustrative guidance as to the parties' responsibilities here.

There is no question that the settlement proposed by Intervenors harms plaintiffs severely. While plaintiffs insist they do not fear the outcome of a malicious prosecution suit, they rightly fear the cost of litigating those issues with Clinton (who has made it plain [to Intervenors, to plaintiffs and to this Court] that he is perfectly prepared to spend sums all out of proportion to what is at issue, as much to punish plaintiffs as for any other reason). Intervenors freely concede they are offering Clinton $500,000 rather than facing the expense of seeing this case through.

It is true, as Intervenors point out, that unless plaintiffs can force Clinton to sign a general release, they remain subject to Clinton's filing such a lawsuit in any case. And while those claims may or may not be insured, the proposed settlement does nothing to change plaintiffs' exposure to being sued. Nevertheless it must be concluded that the proposed settlement would shift onto plaintiffs substantial expenses that would otherwise be borne by Intervenors. Indeed, Intervenors' willingness to view a half million dollars as a bargain to rid themselves of Clinton as an adversary conveys a good idea of the cost to be thrust on plaintiffs should they need to defend a malicious prosecution suit.

Intervenors' proposed settlement also harms plaintiffs by strengthening Clinton's ability to assert a malicious prosecution claim. One prerequisite of such a claim is the bona fide termination of this action in favor of Clinton (*Denton v. Allstate Insurance Co.*, 152 Ill.App.3d 578, 583, 105 Ill. Dec. 471, 474, 504 N.E.2d 756, 759 (1st Dist.1986)). Clinton therefore cannot plausibly initiate a malicious prosecution suit while the fee claim against him is pending.[6]

---

**6.** It might well be argued that the settlement

itself will actually preclude Clinton from main-

Of course, the mere fact that plaintiffs stand to be harmed by Intervenors' proposed action does not necessarily equate with the absence of contractual good faith on Intervenors' part: Intervenors might under some circumstances be willing to suffer comparable harm if the parties' positions were reversed (the Golden Rule test). Hence Intervenors' justification for their acts must also be assessed.

Intervenors argue with some force that requiring them to obtain a settlement that includes a release of the malicious prosecution claim has the effect of requiring them to insure a risk not covered by their policies. Any malicious prosecution claim by Clinton is clearly not a risk covered by Intervenors' policies [7]—and yet a deal including a release of those claims will presumably cost them more than a deal without such a release.[8]

But that argument really poses the dilemma an insurance company often faces when considering settlement. Because "[t]he insurer's duty to defend is broader than the duty to pay, and the insurer may be obligated to defend against claims and causes of action which are not in fact covered by the policy" (*Nandorf, Inc. v. CNA Insurance Cos.*, 134 Ill.App.3d 134, 136, 88 Ill.Dec. 968, 971, 479 N.E.2d 988, 991 (1st Dist.1985)), insurers will sometimes find settling cheaper than defending. Such a settlement could equally well be labeled as "forcing" the insurer to pay on uncovered claims. Hence this case involves at most a difference of degree rather than kind.

Intervenors' initial contention (as to being forced to provide for an uninsured risk) has a second weakness: Insurers routinely obtain general releases for their insureds when settling claims, rather than tailoring the releases to the scope of coverage. For example, in *Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441 (7th Cir.1986) the insurer refused a proposed settlement for covered claims because it did not include a release (which would protect the insured against non-covered claims). Even though that refusal eventually prejudiced the insured, the court found the insurer acted in good faith. *Steele* of course does not control here, but it does provide an example of the type of settlement behavior that should have been expected of Intervenors under the more exacting good faith standard of the Settlement Agreement.[9]

---

taining a malicious prosecution suit because a settlement is not regarded as a favorable termination (*Sutton v. Hofeld*, 118 Ill.App.3d 65, 68, 73 Ill.Dec. 584, 586, 454 N.E.2d 681, 683 (1st Dist.1983)). But plaintiffs understandably say they fear the litigation itself, rather than the outcome. Their only insulation from the burden of defense would appear to be the prospect of sanctions against Clinton under Rule 11 or its new state court counterpart (Ill.Rev.Stat. ch. 110, ¶ 2–611), by reason of his instituting such a lawsuit in the face of the line of authority exemplified by *Sutton*. However, that is a chancy prospect at best (this Court has participated in several recent Illinois Institute of Continuing Legal Education seminars dealing with the new state statute and its relationship to Rule 11 jurisprudence, and the extremely reluctant attitude toward the imposition of sanctions evidenced by the state court judges also participating in those panels does not inspire confidence in the statute's vigorous enforcement). Moreover, plaintiffs would likely be forced to sustain enormous expense during the litigation, even though (if they do survive economically) they might recoup via sanctions at the end.

7. No malicious prosecution or abuse of process claim can be said to have arisen earlier than the time this action was filed in June 1983. CNA's

policy covers only negligent acts or omissions before December 27, 1975. Evanston's policy covers only claims made between August 1, 1978 and September 2, 1981.

8. That presumption, although impeccable in terms of the economics approach to life and to law ("There is no free lunch"), is far from a certainty here. It will be remembered Clinton's price for peace was $500,000 when he was willing to deliver a mutual general release. When he later changed his tune by seeking to reserve a future malicious prosecution action from his release, he did *not* lower his price. Thus Intervenors' argument described in the text might be torpedoed by Clinton's noneconomic real world behavior. There are perils in presuming total economic rationality from all human beings under all circumstances (indeed Clinton's evident willingness to pursue plaintiffs for other than economically sound motives is at the heart of the current dispute).

9. Intervenors point to *Casualty Insurance Co. v. Town & Country Pre-School Nursery, Inc.*, 147 Ill.App.3d 567, 101 Ill.Dec. 669, 498 N.E.2d 1177 (1st Dist.1986), which found an insurer had no duty of good faith to the insured when it settled a claim within the deductible amount for which

Intervenors' second rationale for the proposed settlement has somewhat more plausibility, because it purports to rest on the language of the Settlement Agreement. That Agreement is narrowly drawn to require CNA to pay only "all sums reasonably necessary to settle the presently pending underlying damage litigation" (¶ III.3a). In turn, "underlying damage litigation" is a defined term including only the counterclaim and the Cayman Islands suit. It would require a real stretch of that language to force CNA to pay to settle a potential future malicious prosecution claim in all circumstances. Such a claim is neither "underlying damage litigation" nor "presently pending."[10] Thus the Settlement Agreement does not clearly obligate Intervenors to indemnify, settle or defend a malicious prosecution claim.

But all these countervailing considerations tend to obscure rather than to illuminate the true and obvious answer. As the Settlement Agreement is drafted, the overriding good faith obligation of ¶¶ I.7 and III.1 permeates that entire agreement, requiring Intervenors to settle with Clinton—if at all—as they would desire plaintiffs to act were their positions reversed. Instead, Intervenors have elected to jump ship, leaving plaintiffs defenseless against the imposition of huge expenses by an adversary who has declared himself to be determined and vindictive—and who has the wherewithal and the desire to behave in a noneconomic manner in the pursuit of vengeance (see n. 8).

Viewed in terms of litigation weaponry (for Clinton's stated attitude does not make likely success on the merits the controlling consideration), plaintiffs' pre-settlement position contains an offensive weapon—the ability to continue to assert their fees claim[11] as a litigating factor (or bargaining chip) against Clinton's claims, including his putative malicious prosecution or abuse of process claim. As the result of settlement, however, plaintiffs would be left naked against the latter kinds of claims—in a situation in which the expense of defending such claims would mean that even if plaintiffs win on the merits, they lose in economic terms. As for Intervenors, under such a settlement they would have cut their losses and walked away, leaving plaintiffs in the situation just described. In short, they would turn their right to settle into an "instrument of injury" to plaintiffs (*Yelm*, 123 Ill.App.2d at 404, 259 N.E.2d at 84).

That description dictates the answer to the current issue. Thus the discussion might well end here. Nevertheless, two additional factors (though not really needed) buttress this Court's conclusion and will be mentioned briefly.

First, the exceptions to the general release contained in the proposed settlement are extremely unusual. It is highly unlikely that either Intervenors or plaintiffs would have contemplated such an exception (nor would plaintiffs have permitted one) when they were negotiating the Settlement Agreement. Rather, the normal assump-

the insured was liable. *Casualty* interprets the scope of the implied good faith duty, rather than the Golden Rule provision involved here. Of course the same may be said of *Steele*. But because any judicial holding (as in *Steele*) that a duty exists as to a given set of facts under the implied good faith rule must a fortiori reflect a duty under the Settlement Agreement, while a holding of *no* duty on any set of facts under the former rule need not reach the same result under the latter, *Steele* continues to help plaintiffs here somewhat.

10. Plaintiffs respond by pointing to ¶ III.8, where CNA agreed to "waive all reservations of right heretofore asserted as defenses to coverage under the CNA policies, and to pay all expenses and indemnities arising from the presently pending damage litigation." Plaintiffs assert In-

tervenors have thus waived defenses to coverage of a malicious prosecution claim because it arises from the damage litigation. That contention is without even surface merit. First, the clause waives only reservations of right "heretofore asserted." Second, while a malicious prosecution claim *might* be said to arise from the fee claim, it cannot fairly be said to arise from the damage litigation.

11. This Court recognizes, of course, that any economic proceeds of the fees claim would inure primarily to Intervenors rather than plaintiffs, as the result of the assignment of that claim via the Settlement Agreement. But the effect of the retention of that claim on Clinton as its target, rather than who would derive its benefit, is the relevant factor for the text analysis.

tion would have been for any settlement to contain a general release from Clinton. Indeed, the original agreement between Intervenors and Clinton did call for the latter to sign a general release, with no exception for malicious prosecution.

Second, the proposed settlement contains an exception to that exception, specifically releasing any malicious prosecution claim that *Intervenors* are required to defend or indemnify. In other words, Intervenors are intent only on reaching a complete peace with Clinton, covering every base of their *own* potential liability, while explicitly keeping alive the dispute between plaintiffs and Clinton.

That is betrayal of, not the mandated solicitude for, plaintiffs' interests. Plaintiffs gave Intervenors the right to settle the dispute between plaintiffs and Clinton, not the right to settle on behalf of Intervenors themselves while leaving plaintiffs on the hook. Intervenors' proposal cannot meet the "Golden Rule" standard of good faith to which they are bound.

### Third–Party Beneficiary or Three–Party–Contract Theories

As stated early on in this opinion, plaintiffs do more than say the current proposed settlement is inadequate: They also claim to be third-party beneficiaries of an earlier Intervenors–Clinton contract that included a general release, and they want that contract enforced. In those terms, plaintiffs' claim is certainly novel, and none of the authorities they cite directly support the application of third-party beneficiary principles in a situation such as this—where both parties to a wholly executory contract amend it to the detriment of a putative third-party beneficiary.

There is another possible way of looking at the original Intervenors–Clinton agree-

ment in contract-law terms. It will be recalled that it necessitated action by plaintiffs before it could be implemented—in fact, as stated in the "Background" section of this opinion, it was plaintiffs' refusal to do what was required of them that stymied consummation of the deal.

In the face of that refusal, Clinton continued to insist on the deal as made, demanding that Intervenors deliver as they had promised.[12] It was in that state of affairs that plaintiffs capitulated in late May or early June, surrendering their previously-asserted insistence on a waiver of any ARDC–filed complaint. According to plaintiffs,[13] only then—later in June—did Clinton seek to change the deal by giving less than a general release.

That scenario might arguably be characterized as having created a three-cornered contract (Intervenors, Clinton *and* plaintiffs), rather than a two-party contract of which plaintiffs were third-party beneficiaries, before Clinton changed his mind. In that event it could well be that the contract could not be altered by fewer than all its participants (neither by Clinton alone nor by Intervenors with Clinton, in response to the latter's insistence), so that plaintiffs could insist on enforcing the agreement as it was when all three parties had agreed to it—mutual releases and all. As with the third-party beneficiary approach, however, this Court has not been afforded relevant authority in support of such an analysis.

■ In this diversity action, this Court's role is to apply Illinois law, rather than to speculate as to possible trends at the outer edges of judicial creativity (*Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam)). It is really plaintiffs' burden to identify Illinois authority supporting their right to enforce a contract against both parties (or, viewed differently, the other two parties) to the contract, who

---

**12.** Clinton had confirmed his agreement with Intervenors in a January 23 letter (P.Mem.Ex. 6). His continued insistence on performance of the agreement (which, it will be remembered, included mutual general releases) was reflected in his March 30 (P.Mem.Ex. 7) and April 20 (P.Mem.Ex. 8) letters to Intervenors' counsel.

**13.** This recital should not be misunderstood as reflecting any factual findings by this Court. If and when these issues become relevant to disposition of this action, they will necessitate evidentiary presentations and the resolution of disputed factual contentions.

have agreed as between themselves to change its terms. They have not even tendered anything looking in that direction (from Illinois or anywhere else), let alone anything rising to the level of supporting authority. Both their third-party-beneficiary argument and any alternative three-party-contract argument must be rejected for now.[14]

### Conclusion

Intervenors' motion to intervene is granted, and leave is granted to file their Intervening Complaint instanter. However, the settlement they propose does not satisfy their responsibility under the Settlement Agreement.[15] Accordingly their motion to dismiss plaintiffs out of this action, in turn to enable Intervenors to obtain dismissal of the action itself, is denied. This action is set for a status hearing at 9 a.m. December 2, 1987 to discuss the future course of the litigation.

### Appendix

Without seeking leave of court, Clinton has filed a so-called "affidavit" in support of Intervenors' motion, in which he claims he always intended to reserve the right to sue for malicious prosecution. That current assertion as to his purported earlier intention appears to be directly belied by his earlier (and contemporaneous) statement in which he expressed his understanding of the settlement deal he made with Intervenors (his letter of January 23 to Intervenors' counsel detailing the agreement, later reconfirmed in his letters of March 30 and April 20) (P.Mem.Exs. 6–8). In Clinton's initial January 23 summary of the deal, he referred to delivering *general* releases, without any hedge at all (for a malicious prosecution claim or otherwise).

But that factual issue is not a subject for adjudication on the present motion, so Clinton's uninvited affidavit really occupies no proper place in today's ruling. There is more, however. As this Court has had occasion to remark from time to time in other opinions, there is a practice prevalent among the New York bar (and perhaps elsewhere, though this Court is unaware of such wider usage) of attaching a jurat to a melange of facts, generalized conclusions, argumentative advocacy (including legal arguments) and other miscellany—then labeling the end product an "affidavit." That notion, out of place with the real concept of an affidavit (a sworn statement of matters admissible in evidence, see Rule 56(e)) has never caught on in the hinterlands of Illinois.

Clinton, himself a lawyer and former Illinois practitioner, has filed just such an impermissible non-affidavit "affidavit" that partakes of various of the deficiencies referred to in the preceding paragraph of this Appendix (though he begins by saying "I am over twenty-one years of age and if called upon to testify could competently testify to the following facts," an examination of the contents that follow that statement discloses all too much that would be clearly inadmissible). Plaintiffs' motion to strike the affidavit speaks specifically to many of its assertions, but there is no need to rewrite such a pervasively defective document for the affiant. It is stricken in its entirety.

---

**14.** This opinion expresses no views as to whether or not an enforceable contract was initially formed as between Intervenors and Clinton or as to whether or not plaintiffs' now-withdrawn objections to the original deal bar them from now seeking its enforcement.

**15.** Intervenors also request a declaration that they have no duty to seek a settlement barring Clinton from filing a claim with the ARDC. Plaintiffs have withdrawn that demand and neither party has briefed the issue. It is moot.