(No. 49812.-

ROY J. SMILEY *et al.,* v. MANCHESTER INSURANCE & INDEMNITY COMPANY OF ST. LOUIS.— (Manchester Insurance & Indemnity Company of St. Louis, Appellee, v. William D. Knight, Jr., Appellant.)

*Opinion filed April 3, 1978.*

GOLDENHERSH and MORAN, JJ., took no part.

Reno, Zahm, Folgate, Skolrood, Lindberg & Powell, of Rockford (Robert K. Skolrood, Robert A. Fredrickson, and Mark W. Boswell, of counsel), for appellant.

Barrick, Jackson, Switzer, Long & Balsley, of Rockford (Peter S. Switzer, of counsel), for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

In this third-party proceeding in the circuit court of Winnebago County, Manchester Insurance & Indemnity Company of St. Louis (hereinafter referred to as Manchester) sued attorney William D. Knight, Jr., for malpractice, alleging that his negligent acts in defense of an insured, Charles Toney, resulted in its liability for damages in excess of the policy limits. Knight counterclaimed, seeking fees allegedly due him for legal services rendered. After trial, the jury found for Knight on the malpractice issue and for Manchester on the issue of fees. Manchester appealed, alleging alternatively that the trial court had erred in failing to grant a directed verdict, a judgment notwithstanding the verdict, or a new trial. The appellate court held that the trial court erred in denying Manchester's motion for a directed verdict or judgment notwithstanding the verdict and ordered a new trial on the issue of damages alone. (49 Ill. App. 3d 675.) We granted

Knight's petition for leave to appeal.

The original lawsuit was brought against the estate of Charles Toney for damages arising from an automobile accident on February 13, 1967. The accident occurred when Toney's car crossed the center line of the road and collided with a vehicle in which Roy J. Smiley and Byron Emanuel were riding. Smiley was injured, and Emanuel was killed, as was Toney. Toney's two passengers, Lemeau and Isizia Arnold, were injured.

Attorney Bernard P. Reese was retained to represent Smiley and the administrator of Emanuel's estate. After discovering that the only asset in Toney's estate was a Manchester insurance policy with limits of $10,000 per person and $20,000 per accident, Reese attempted to settle for policy limits with William Eastman, an insurance adjuster representing Manchester. During the course of their communications, Reese told Eastman he hoped the insurance company would refuse to settle so that he could establish bad faith refusal to settle within policy limits and thus support an attempt to collect from the insurance company any verdict he would recover in excess of the policy limits. Eastman made a full report of his investigation and Reese's comments to Manchester; however, they refused to settle or make a counteroffer. On October 4, 1967, Reese brought suit against Toney's estate, seeking $100,000 for the wrongful death of Emanuel and $50,000 for Smiley's personal injury. Manchester assigned the case to attorney Knight on November 16, 1967, and sent him the complete case file, including Eastman's reports of the investigation and conversations with Reese. On November 27, 1967, Knight received notice that Toney's passengers, the Arnolds, had also been injured and were represented by attorney Clifford Stoner, although no suit had been filed on their behalf.

William Blackwell, claims supervisor for Manchester, testified that he had a phone conversation with Knight on

November 27, 1967, in which he suggested that Knight try to get all the claimants together and "see if some settlement couldn't be made." On December 6, 1967, Blackwell sent Knight a letter stating:

> "[W]e should probably make some effort to get the claimants together, and make some disposition of all of the claims, and effect whatever savings of the policy limit possible for a final disposition, as far as we are concerned.
> Please proceed with your handling, with the above in mind and keep us advised."

In December 1967 Knight took the deposition of an occurrence witness, Glenn Carpenter, which indicated that Toney, the insured, was on the wrong side of the road when the accident occurred. In January 1968 he mailed this deposition to Manchester. On June 4, 1968, the case was set for trial on June 24, 1968. At this time, he wrote Manchester for instructions. On June 18, 1968, Knight took a deposition from plaintiff Smiley. According to the deposition, Smiley had suffered a multiple fracture of his jaw, a fractured ankle requiring screw fixation, a concussion, and loss of teeth, had spent approximately $1,600 in medical expenses, and had missed work for 2½ months, thereby losing approximately $2,000 in wages. At some time after June 4, 1968, but prior to June 18, 1968, Knight also took a deposition from Emanuel's widow. This deposition indicated that at the time of his death, Emanuel was 26 years old, in good health and married, with a 3½-year-old son. He had graduated from high school, attended DeVry Electrical School for advanced training, and netted approximately $125 per week at his job. The expenses in connection with his death were approximately $3,200. Knight also discovered that the Arnolds had never made a demand to settle, nor had they filed suit on their claims.

At 2 p.m. on June 18, 1968, Blackwell had a telephone conversation with Knight. At that time he

authorized Knight to use $20,000 to settle all claims arising from the accident; $17,000 to dispose of the Smiley and Emanuel claims and $3,000 for possible claims of the Arnolds. Knight spoke with Reese on June 18, at 4 p.m., at which time Reese renewed his demand to settle both claims for $10,000 each. Knight did not make a counteroffer.

Knight also had a conversation with Blackwell on June 21, 1968, at 4:20 p.m. regarding Manchester's instructions for handling the case. Each testified to conflicting versions of the conversation. Blackwell testified that Knight explained Reese's demands to settle both claims for the policy limits, but was unable to remember whether Knight had told him he had not offered the $17,000 settlement to Reese. Blackwell further testified that he specifically authorized Knight to settle the Smiley and Emanuel claims for the full policy limit of $20,000 in order to avoid a jury verdict against Manchester.

According to Knight's version of the conversation, he informed Blackwell that he had not offered the $17,000 and Blackwell instructed him to "try the case, go all the way." He maintained that Blackwell never gave him authority to settle the Smiley and Emanuel cases for $20,000. Knight also testified that he requested written confirmation of the conversation from Blackwell.

On June 24, 1968, prior to the jury selection, Knight and Reese met in conference with the trial judge. The following conversation took place:

"Mr. Reese: Is there any offer of settlement in this case, for the record?

Mr. Knight: I have no comment on that.

Mr. Reese: I want to know on behalf of Roy Smiley, whether the injuries and the liability is clear and we offer to settle Mr. Roy Smiley's case for $10,000.00.

Mr. Knight: I have no comment.

Mr. Reese: We do likewise, with reference to Patricia Emanuel [Emanuel's widow].

Mr. Knight: I have no comment on that."

The case proceeded to trial, and on June 25, 1968, at about 3 p.m., while the jury was deliberating, Knight received the following written memorandum from Blackwell:

"6/21/68

Dear Mr. Knight

Confirming our conversation this date, you do have auth. to offer our policy limit of 20,000 to dispose of the pending suits should the need arise.

/s/ W.C. Blackwell"

After receipt of this message, Knight did not make an offer of any type to Reese, nor did he call Blackwell. He later explained that he felt the memo was consistent with his authority to use $17,000 and hold $3,000 in reserve for the Arnolds. About two hours after Knight received this letter, the jury returned verdicts in favor of Smiley for $25,000 and in favor of Emanuel's estate for $50,000, the latter being reduced by the court to the $30,000 then-maximum statutory amount. Manchester paid the judgments to the extent of the policy limit of $20,000 plus interest. Reese then obtained an assignment, from the insured's estate to his clients, of all claims against Manchester. In November 1968 he brought an action against Manchester to recover the amount of the judgments in excess of policy limits, alleging a bad faith refusal to settle the cases within policy limits. Summary judgment was entered against Manchester for $35,000 plus interest. On appeal, the summary judgment was affirmed. (*Smiley v. Manchester Ins. & Indem. Co.* (1973), 13 Ill. App. 3d 809.) Prior to appeal, however, the instant third-party action was commenced by Manchester, charging Knight with negligence resulting in liability in excess of the policy limits.

During the trial on this third-party complaint, Knight and Blackwell testified as to the various developments, as

heretofore mentioned. Blackwell also testified as to reports of the accident investigation and early correspondence with attorney Reese as relayed to him by the adjuster, William Eastman. Knight indicated that he had never bothered to offer the $17,000 because he felt it would be a useless gesture in light of Reese's continual demand for $10,000 apiece for both claims. He also testified that he felt the memo he received on June 24, 1968, was consistent with the June 18 instruction to spend $17,000 and reserve $3,000 and the June 21 instruction to "try the case, go all the way."

Attorney Reese also testified at the malpractice trial. He stated that although he noticed nothing unusual about Knight's actions, he was puzzled by Manchester's refusal to settle. In addition, while he confirmed Knight's statement that he would not have settled for less than $10,000 each for both claims, he admitted that he might have changed his position if Knight had not said "no comment" when asked about his authority to settle.

Manchester called Larry E. Ohlson, an attorney from the area, to testify as an expert witness as to what a reasonable attorney would have done. He testified that, based on his knowledge of the case file and even assuming that the attorney actually had only $17,000 authority and no memo had been sent, he had failed to exercise the degree of reasonable care usually exercised by lawyers in the area. He further stated that if the attorney had received the memo during jury deliberations, his failure to notify the plaintiff's attorney or the court, or to contact the insurance company, constituted a failure to exercise reasonable care, particularly since the claims appeared to be worth the policy limits and an adverse verdict might expose the insurer to excess liability.

Attorney Clifford E. Stoner, who had represented the Arnolds, testified that Knight had never contacted him regarding his clients' claims. Knight himself testified that

he had not been given the responsibility to handle the Arnolds' claims. At the close of the trial, the jury returned a verdict for Knight on the malpractice suit and a verdict for Manchester on the counterclaim.

On appeal by Manchester, the appellate court reviewed the testimony and reversed the jury verdict for Knight on the grounds that such a verdict could never stand, even when the facts were viewed in the aspect most favorable to Knight.

Knight contends that the appellate court, in finding him negligent as a matter of law, misapplied the standard for a directed verdict or judgment notwithstanding the verdict in light of the factual questions presented at trial. He further argues that even if he were negligent, the appellate court erred in equating a finding of negligence with liability. He contends that since the appellate court only found he was negligent as a matter of law and reversed on that basis, without considering contributory negligence or proximate cause, in effect, the court eliminated the requirement that Manchester prove due care and proximate causation.

We deal first with the issue of whether the evidence justifies a directed verdict or judgment notwithstanding the verdict on the question of Knight's negligence.

It is clear that an attorney is liable to his client only when he fails to exercise a reasonable degree of care and skill; he is not liable for mere errors of judgment. (*Brown v. Gitlin* (1974), 19 Ill. App. 3d 1018; *Dorf v. Relles* (7th Cir. 1966), 355 F.2d 488.) In viewing the evidence in this case most favorably to Knight, we must affirm the decision of the appellate court that as a matter of law he failed to act as a reasonable and skillful attorney in the area. The uncontroverted evidence at trial shows that as early as November 1967 he was instructed to attempt settlement with all of the claimants. He never contacted the Arnolds, nor did he ever discuss settlement with their attorney,

Clifford Stoner, testifying that he had not been hired to handle their claims. The undisputed evidence also shows that on June 18, 1968, Knight was expressly authorized to settle the Smiley and Emanuel claims for $17,000 and to reserve $3,000 for the Arnolds. In spite of this authority, he never offered *any* amount to settle the claims, nor did he disclose his authority to Reese or to the trial judge. On June 24, 1968, at the start of the trial when Reese asked if there was any offer and renewed his demand to settle the cases for policy limits, Knight replied "no comment." Even if we accept Knight's testimony that he only had $17,000 authority, his complete inaction when he had knowledge of the seriousness and probable liability of the claims clearly did not comport with the actions of a reasonable attorney. In addition, the evidence shows that Knight had the complete file, including the adjuster's report of Reese's plan to sue in an attempt to collect any judgment in excess of policy limits. His failure to make even a token offer on the record constituted strong proof of bad faith in support of the claim for recovery of the excess. Even if Reese would not have accepted $17,000 in settlement, such an offer would at least support a claim by Manchester of a good faith attempt at settlement. Attorney Ohlson also testified that even if Knight only had $17,000 authority, he had not acted reasonably in failing to offer it.

We note that Knight's testimony as to his June 21, 1968, conversation with Blackwell was contradictory to Blackwell's version. According to Knight, he was instructed to take the case to trial and was never authorized to use $20,000 to settle the Smiley and Emanuel claims. He stated that he asked for written confirmation of these instructions. However, the written confirmation Knight received on June 25, 1968, was clearly inconsistent with his version of the conversation. The memorandum did not direct him to settle the Smiley and Emanuel claims for

$17,000, reserving $3,000, nor did it instruct him to "try the case, go all the way." It expressly authorized Knight to offer the policy limits of $20,000, if needed, to dispose of the *pending suits*. Since the Smiley and Emanuel claims were the only suits pending, it is plain that Knight's interpretation that the memorandum only confirmed his $17,000 authority and instructions to try the case is unreasonable. The memorandum clearly authorized him to use $20,000 to settle the only claims at suit. At the time Knight received the memorandum, Reese's offer to settle both cases for $20,000 was still open. Ohlson testified that since cases can be settled at any stage of the proceedings, assuming that Knight received the memo during jury deliberations, he acted unreasonably in failing to tender the policy limits to Reese. Even Reese admitted that if Knight had authority to settle for $20,000, the absence of any offer would be unusual. Under these facts, we hold as a matter of law that the evidence, when viewed most favorably to Knight, clearly indicates that he breached his duty to Manchester, thus exposing it to excess liability. As to the issue of Knight's negligence, therefore, we affirm the appellate court decision.

Knight also contends that even if he were found to be negligent as a matter of law, the appellate court erred in reversing the jury verdict in his favor. He argues that even if the jury had found him to be negligent, it could have decided that Manchester had been contributorially negligent or that his negligence was not the proximate cause of damage.

The evidence adduced at trial showed that Manchester was aware that the case may have been one of liability as early as March 1967. Blackwell testified that he had determined, as early as March 1967, that the possible value of Smiley's and Emanuel's claims was probably in excess of the policy limits, although he did not conclude that the insured was liable until December 1967. The vice-president

and general counsel of Manchester wrote a letter to a reinsurer on August 4, 1967, which indicated he was aware of the extent of injuries, the likelihood of liability and the probability that liability would exceed the policy limits. Apparently it is Knight's theory that the jury could have concluded from these facts that Manchester was contributorially negligent in failing to settle the claims at an early stage. Such a conclusion would be erroneous. The mere fact that an insurer makes a preliminary evaluation of liability based on an adjuster's investigation does not mandate immediate settlement of the claims. The evidence shows that one eyewitness was not located until December 1967. In fact, depositions were not taken of the two claimants until June 1968. Under Knight's theory, an insurer would have a duty to immediately settle a case as soon as it became aware of facts indicating fault. This theory ignores the realities of the settlement and litigation process. In addition to investigating the factual occurrence, both parties must research the applicable legal principles, ascertain the possibility of success at trial, and determine the nature and extent of damages to a reasonable certainty. Thus, we hold that Manchester's failure to settle at an early stage did not constitute contributory negligence.

Knight also argues that certain specific behavior by Manchester indicates its contributory negligence. This contention is without merit. In our opinion, any acts by Manchester substantially prior to trial are irrelevant. The evidence clearly shows that Reese's offer to settle for $20,000 was open from 1967 through the trial. Knight received $17,000 authority to settle on June 18, 1968, almost a week before trial, yet he never made an offer to settle. Without repeating the various acts of Knight which we have found to constitute negligence as a matter of law, we hold that, under these facts, it is clear that the excess liability was proximately caused by Knight's inaction, not

Manchester's behavior.

Knight cites *Knobloch v. Royal Globe Insurance Co.* (1976), 38 N.Y.2d 471, 344 N.E.2d 364, 381 N.Y.S.2d 433, for the proposition that a last-minute tender of policy limits by an insurance company does not preclude a finding of bad faith if the case is not settled. The facts of *Knobloch* are quite different from those in our case. In *Knobloch,* not only had the plaintiff withdrawn his offer to settle within policy limits before trial, but it was also a continuing course of conduct on the part of the insurer toward the insured prior to trial that evidenced bad faith. Here, however, at the beginning of the trial plaintiff's counsel requested if there was any offer to settle. Although Knight at that time, according to his own testimony, had authority to offer $17,000, he remained intransigent and replied "no comment." Plaintiff's counsel then offered to settle each claim for $10,000, and that offer was never withdrawn. When the written memorandum arrived while the jury was deliberating, Knight plainly had the authority to meet this demand, and he made no effort to do so. We cannot now seriously consider the tenuous argument that the offer might not have been accepted at this late date if made. It was Knight's complete failure to make any offer or to attempt any negotiations that firmly established the excess liability case against Manchester. On the facts of this case we must hold as a matter of law that the evidence viewed most favorably to Knight so overwhelmingly favors Manchester that a verdict for Knight could never stand. Accordingly, we affirm the judgment of the appellate court.

*Judgment affirmed.*

GOLDENHERSH and MORAN, JJ., took no part in the consideration or decision of this case.