LESTER J. SALVATOR, Plaintiff-Appellee, v. ADMIRAL MERCHANTS MOTOR FREIGHT, d/b/a Transcontinental Express, Defendant-Appellant (John Peasley, d/b/a Peasley Trucking, Defendant).

Fourth District    Nos. 4—86—0673, 4—86—0761 cons.

Opinion filed June 22, 1987.

Dowd & Dowd, Ltd., of Chicago (Michael E. Dowd and Joel S. Ostrow, of counsel), for appellant.

Fellheimer, Fellheimer, O'Dell, Travers & Luckman, Ltd., of Pontiac (Robert M. Travers, of counsel), for appellee.

PRESIDING JUSTICE SPITZ delivered the opinion of the court:

This appeal results from a summary judgment on liability being granted to the plaintiff against Admiral Merchants Motor Freight (Admiral) and a subsequent jury verdict for compensatory and punitive damages.

The basis of plaintiff's claim is that Admiral had a duty to defend him in a lawsuit in which he and Admiral were defendants in the State of Oregon as a result of an accident that occurred there when plaintiff was driving, that Admiral failed to defend him and failed to pay the resulting default judgment within a reasonable time, that he lost his driver's license and his means of livelihood as a result of Admiral's failure to resolve the dispute in a reasonable manner, and that the conduct of Admiral was outrageous and caused him to suffer extreme mental distress. Admiral asserted that its independent contractor agreement with plaintiff contained no duty to defend and that no such duty existed at common law. Admiral further alleged that plaintiff failed to adequately notify it of his expectation that it would defend him until it was too late to raise any duty to defend the cause of action. On cross-motions for summary judgment, the trial court granted plaintiff's motion on the issue of liability.

Regarding damages, Admiral moved to dismiss the punitive count, contending that punitive damages are not available in a breach of contract action absent compelling circumstances not present here. The lower court denied the motion. Admiral further sought a ruling that the type of compensatory damages sought by plaintiff, alleged medical problems and lost wages, were not available in a duty to defend case. The lower court ruled adversely to Admiral on this issue also.

Upon a trial before a jury on damages only, a compensatory award of $138,450 was assessed against Admiral and a punitive award of $50,000 was also granted. Judgment was entered on the verdict. Admiral's post-trial motion, reraising all of the foregoing contentions, was denied. Defendant Admiral filed a timely notice of appeal. The other defendant, John Peasley, d/b/a Peasley Trucking, was dismissed from certain allegations in the case and settled with Wymore in the remaining ones. It is not involved in this appeal.

The following facts can be adduced from the record, and are not

in dispute. On July 8, 1981, plaintiff, Lester J. Salvator, signed an independent contractor operating agreement in which the defendant, Admiral Merchants Motor Freight (Admiral), agreed to "maintain at its own expense public liability, property damage and cargo insurance as concerns shippers and the general public." At the time that the independent contractor operating agreement (agreement) was signed, Salvator believed that the agreement provided public liability and property damage insurance. Unknown to Salvator at the time of signing was the fact that defendant Admiral was apparently "self-insured" for the first $25,000 of coverage, meaning that they would be responsible for the first $25,000 of losses incurred. Glenn Brett, vice-president of Admiral, stated that they did not advise anyone outside of their own company of their self-insured status. The first time that plaintiff would have been in a position to know that defendant was self-insured would have been when a claim was made. The agreement itself was drafted by someone on behalf of defendant.

On July 14, 1981, an accident occurred in the State of Oregon while plaintiff was operating under the terms of the agreement. The accident involved a truck owned by Wymore Transfer Company. Within 30 minutes of the accident plaintiff reported the occurrence to Glenn Brett.

Thereafter, defendant, primarily through Glenn Brett, received several items of correspondence from Geisy, Greer, Gunn, Inc., an insurance adjuster which defendant had hired to evaluate the claim. By a letter dated July 17, 1981, defendant was notified of the extent of the damages to the Wymore vehicle. By a letter dated August 17, 1981, the adjusters received invoices for repairs made to the Wymore vehicle which totaled $11,729.20. This letter was forwarded to defendant. The adjusters sent a letter to defendant, dated August 19, 1981, stating that "the claim for repair damage appears reasonable, as does the claim for down time." The adjusters also stated that "this appears to be a case of liability against the insured operator for an improper turn and failure to yield right-of-way prior to changing lanes." The adjusters recommended prompt payment of the net property damage claim. By a letter dated August 27, 1981, the adjusters requested payment of Wymore's property damage claim, and made reference to the fact that a similar request had been made by a letter dated August 19, 1981. By a letter dated October 6, 1981, and received by defendant, the adjusters indicated that Wymore had not as yet received payment of their claim, and advised defendant that there was an 18% annual interest charge on

the unpaid balance and that the charge would be assessed if payment was not received within a reasonable period of time. By a letter dated November 11, 1981, from the adjusters to defendant, the adjusters indicated that Farmers Insurance Group (Farmers), the insurance company for Wymore, was proceeding to pay the damage under the terms of its own policy. Defendant was also advised that a subrogation claim was being forwarded to his office. The letter lists the amount of property damage experienced by Wymore as $11,729.20. Defendant's adjusters then indicate that their handling of the matter had been concluded except for the forwarding of Admiral's payment of the property damage claim. By a letter dated January 25, 1982, to defendant from the adjusters, defendant was notified of a certain correspondence from Farmers Insurance.

This letter from Farmers makes a claim for payment of $11,599.90. By a letter dated February 2, 1982, from Farmers to defendant, Farmers requests payment of $11,599.90 in regard to their subrogation claim. This letter was received by Brett on February 5, 1982, as evidenced by the file stamp in the lower right-hand corner of the document. By a letter dated March 31, 1982, from Farmers to defendant, Farmers again requested payment of $11,599.90 in regard to its subrogation claim. The letter indicates that Farmers' insured "is quite anxious to receive his $1,000.00 deductible." By a letter dated April 27, 1982, from Farmers to defendant, Farmers advised defendant that they had received no response concerning their previous correspondence and if they did not hear from him within 15 days of the date of the letter, it was their intention to turn the matter over to their attorney for collection. Brett received this letter on April 29, 1982, as evidenced by his initials and the date in the lower right-hand corner.

On June 3, 1982, a letter was sent to Wymore from a credit and collection service on behalf of Admiral, stating, in part:

"We have been asked by Admiral Merchants Motor Freight, Inc. to assist them in effecting a reconciliation of their various creditors on claims incurred prior to May 1, 1982.

*** We have attached a balance sheet for Admiral Merchants Motor Freight, Inc. reflecting the condition of the company as of December 31, 1981. You will note that the balance sheet reflects a substantial loss.
***

Although Admiral Merchants is currently unable to pay all claims in full, it has authorized us to make the following offers based upon each creditor's principal claim corresponding

in amount with that recorded on Admiral Merchant's books and records:

a) Payment in full by a five-year non-interest bearing promissory note, payable 10% of the principal at the end of the second year following the issuance of the promissory note, 10% at the end of the third year, 20% at the end of the fourth year, with a final payment (being 60% of the fact amount) at the end of the fifth year;

or

b) At your election twenty cents ($0.20) on the dollar in full and final settlement of your claim, payable within sixty (60) days after approval of the principal amount of your claim.

* * *

It is the opinion of the undersigned that any action taken by creditors in an effort to gain an advantage over other creditors will result in the debtor seeking protection under Chapter 11 of the United States Bankruptcy Code.''

By a letter dated June 15, 1982, Wymore notified Salvator and Admiral that if certain sums were not paid within 10 days of the date of the letter, legal proceedings would be instituted.

Subsequently, Wymore filed suit in the circuit court of the State of Oregon for the County of Multnomah against both Admiral and Salvator, as codefendants. The summons and complaint were served on Admiral on July 27, 1982, and on Salvator on July 28, 1982. Neither Admiral nor Salvator appeared in response to the complaint and summons. Subsequently, Wymore filed a motion for order of default. On October 21, 1982, the trial court entered an order of default and a default judgment in the amount of $11,871.44 against both Admiral and Salvator.

By a letter dated October 25, 1982, Admiral was notified that the default judgment was taken, and that unless payment was made within 30 days, further legal action would be taken.

By a letter dated December 20, 1982, Admiral was informed that Wymore would request that Salvator's license be suspended if payment of the judgment was not received by December 26, 1982.

On April 13, 1983, Robert M. Travers, attorney for Salvator, sent a letter to Admiral. This letter stated that as a result of the defendant's failure to avoid a judgment in Oregon or to provide proof of financial responsibility to the Secretary of State in Oregon, an order of suspension had been entered against Salvator effective April 25, 1983. A copy of the order of suspension from the Secretary of State for the State of Illinois was attached to this exhibit.

The letter also stated that plaintiff is a teamster, that his sole source of income is from truck driving, and that if his license was suspended "we will look to your company for damages." The notice of suspension attached to this exhibit states:

> "You are not permitted to secure a new drivers license or renewal registration plates until you have satisfied the above stipulated judgment or made arrangements with the approval of the Trial Court, to pay the judgment in installments and file proof of your financial responsibility for the future. This suspension will remain in effect until you have been notified that your privilege to obtain a drivers license and/or registration plates has been acknowledged in writing by this Department."

Salvator's license was suspended on April 25, 1983. On May 25, 1983, Travers sent a letter to Admiral, stating in part:

> "Admiral *** was the insurer responsible for satisfying the judgment that was obtained by Wymore Transportation Company and *** you have known about your responsibility since shortly after the accident occurred.
>
> I am reluctant to place any deadlines on your company; however, my client's license has been suspended since April, thereby making it impossible for him to work at his profession. With that in mind, I am going to suggest to you that if this matter is not cleared up within ten days of the date of this letter, I will immediately contact the Department of Insurance of the State of Illinois. If the matter is still unresolved fourteen days after that, I will file suit in the Circuit Court for McLean County, Illinois against your company."

On November 1, 1983, a letter was sent on behalf of Admiral to Wymore, stating, in pertinent part:

> "[W]e have settled a majority of the cases involving Admiral Merchants at $.20 on the dollar. We have settled a number of cases that have gone to judgment at $.50 on the dollar. I am, therefore, authorized to offer to you the fifty percent (50%) settlement figure."

On December 13, 1983, Salvator filed his suit against Admiral.

On February 29, 1984, Admiral and Wymore reached a settlement pursuant to which Admiral was to pay $1,000 per month for seven months for a total of $7,000. The final payment was made on August 29, 1984.

A "Satisfaction of Judgment" dated September 13, 1984, was docketed in the Oregon suit on September 25, 1984, and Salvator's

license was reinstated on October 25, 1984.

On April 28, 1986, a motion hearing was conducted. Salvator was granted summary judgment against Admiral on the issue of liability only. The cause was then continued for a jury trial on the issue of damages only. On May 15, 1986, a jury trial commenced on the issue of the amount of damages Salvator was entitled to.

Robert Cooney, of the Illinois Secretary of State's office in Springfield, testified that plaintiff's license had been suspended in April of 1983 because an unsatisfied judgment had been reported to his office by the State of Oregon. Cooney stated that the license could not be reinstated until the judgment was satisfied, and that in this instance, plaintiff's license became reinstated on October 25, 1984.

Jason Hockenberry, an official of the Teamster local where plaintiff was a member, testified that there were several jobs for which plaintiff was qualified during the time his license was suspended, but they could not be given to him due to the suspension.

Doctor Dalisay Bello-Manabat also testified on behalf of plaintiff. She first treated plaintiff on April 14, 1983, when he presented himself to her with chest pains and shortness of breath. She testified that she recommended a series of tests to him, but he told her he could not afford them since he did not have a job. She did not see him again until he was hospitalized in September of 1983 with chest pains. The ultimate diagnosis was unstable angina or mild heart attack. She testified that this could be caused by stress, and that the stress could be caused by loss of a job or financial problems. Dr. Bello-Manabat further testified that plaintiff was rehospitalized for further treatment in November of 1983, that he was suffering from a progressive disease which medication can only control, and that he would continue to have episodes of severe pain and would have future medical expenses to bear.

Edward Bowers, a friend of plaintiff's who was present when plaintiff was served with the Oregon summons in July of 1982, also testified in plaintiff's behalf. Bowers testified that plaintiff continuously talked about the lawsuit and became increasingly depressed, particularly about money problems. Glenda Black, another friend of plaintiff's, gave substantially the same testimony.

Plaintiff also testified in his own behalf. He testified that he has been a truck driver for 28 years, that he was a member of the Teamsters but was behind on his dues, and that he was never in an accident, nor did he receive a ticket, before July 14, 1981. Plaintiff further testified that he had never had difficulty finding employment

before April 25, 1983. Plaintiff also testified that in July of 1981, he was working for Peasley when he signed the independent contract operators agreement involved in this case, having read it first. The accident, which occurred on July 14, 1981, in Oregon, involved a collision with another truck, and plaintiff was issued a ticket for an illegal right turn. He pleaded guilty to that charge. Plaintiff testified that within a half hour of the accident, he had contacted Brett, and notified him. Plaintiff further testified that he drove for Admiral many times after the accident, even back to Oregon.

In July of 1982, plaintiff was served with the Oregon lawsuit. He stated that he was "dumbfounded" at first. He also stated that he called Admiral and talked with a Mr. Seitz, a vice-president of Admiral, who told him they were taking care of the matter. Plaintiff testified that he sent the summons to Peasley, and that he also contacted his union, but was told the union could not help him. Plaintiff further testified that prior to the service of the summons, a letter had been sent to him by Wymore's attorney threatening to suspend his license, with a copy of that letter being sent to Admiral. Plaintiff continued to receive letters such as that one, notice of the default and letters from the Oregon and Illinois Secretaries of State offices. Plaintiff testified that he contacted the Secretary of State's office, Peasley's insurance company, Admiral's insurance company and his union regarding these letters.

Plaintiff testified that he was continually upset and angry over the situation, and ultimately went to see Dr. Bello-Manabat in March of 1983. Plaintiff then gave the history of his medical treatment, lost income, depression and application for public aid. Plaintiff testified that he had never been able to recover financially from this situation. He testified that he even sold his $250 wedding band for $25 to buy groceries. Plaintiff further testified that he felt badly about depending on friends, embarrassed about not having employment, and upset about not being able to visit his children in Florida. He testified that he also noticed a relationship between his heart problems and the times he would worry about his license. He testified that he takes medication three times a day, has become quick tempered, and is difficult to get along with. On cross-examination, plaintiff acknowledged that he never sent the summons, complaint or other correspondence to Admiral regarding being sued or being defaulted.

Plaintiff had examined Brett as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102). As part of his responsibilities at Admiral,

Brett handles claims. He has the ultimate responsibility for settling claims and granting authority to attorneys to handle claims. Brett identified that portion of the independent contractor operating agreement which stated that Admiral "shall maintain at his own expense, public liability, property damage and cargo insurance coverage as concerns shippers and the general public." Brett testified that at the time of the accident, Admiral was self-insured for the first $25,000 to $30,000 for damage to third parties, with excess coverage being carried through Protective Insurance Company. Brett acknowledged that he was notified of the accident by plaintiff when it occurred. Brett testified that when the initial demand for settlement came in, he thought that the labor portion of the bill was too high. Brett testified that due to financial conditions at the time, Admiral would not have been able to pay the amount sought by Wymore at the time of the initial demand for settlement. Brett testified that he never offered the full amount that was demanded. Brett testified that neither Peasley nor a driver would have been aware of Admiral's being self-insured, nor of its financial difficulties, unless and until a claim was made. Brett stated his belief that Admiral lived up to its insurance agreement because it negotiated and ultimately paid the claim made. He denied that the promise made in the agreement about insurance was a "fraud" as asserted by plaintiff's counsel. Brett testified that he believed Admiral's responsibility was to undertake any liability in the best way it could, and not to immediately settle any claim that was made.

Brett acknowledged receiving plaintiff's attorney's first letter to him on May 2, 1983, the letter stating that plaintiff was going to lose his license if the judgment was not paid and would hold Admiral responsible. Brett testified that he sent this letter to Admiral's attorney. Brett acknowledged that the adjusters he hired in Oregon recommended an $11,000 settlement in 1982. In March of 1982, Brett received a subrogation notice from Wymore's insurance company, which threatened legal action if the claim was not settled. Brett also acknowledged that by July of 1982, Admiral had offered to settle the claim either by paying 20% of it in 60 days or the full amount over five years with no interest. When the summons and complaint were served upon Admiral in July of 1982, Brett was on a temporary retirement; however, as far as Brett knew, no attorney was ever hired in Oregon to defend either Admiral or plaintiff. Brett was also unaware of any action being taken when the default was learned of. Brett further testified that he received an opinion from an insurance broker in March of 1983 that Admiral owed "cov-

erage" to plaintiff for the consequences of the accident. Brett was unaware of any efforts that might have been made by Admiral to protect plaintiff's driver's license. Brett testified that while he knew of the original suspension, he was never informed how long it lasted or if it was continuing. Brett testified that the financial status of Admiral was the only reason it took so long to settle the case. Brett testified that no authority was given to the adjuster hired in Oregon to commit Admiral to a settlement.

At the close of plaintiff's case, defendant moved for a directed verdict as to punitive damages. The motion was denied. A similar motion was denied with respect to compensatory damages for alleged medical expenses. Plaintiff's motions to strike certain affirmative defenses were granted, consistent with the trial court's earlier summary judgment rulings.

On May 19, 1986, following closing arguments and the giving of instructions, the jury returned a verdict in favor of Salvator in the amount of $138,450 in compensatory damages for lost wages and medical expenses and $50,000 punitive damages, plus court costs.

Within the requisite time, Admiral filed its post-trial motion, reiterating the same bases as had been claimed during the summary judgment and the directed verdict phases of the case. This motion was argued to the court on September 3, 1986. Admiral's counsel again argued that, as a matter of law, all the contract required Admiral to do was to satisfy any judgment against plaintiff and that it had done so, and that it had no duty to defend him in the Oregon action. Also reargued were Admiral's contentions with regard to the types of compensatory damages which the jury was allowed to consider. Defendant also contended that plaintiff had waived any duty that might have existed by his failure to notify Admiral that he had been served in the Oregon suit. The court ultimately denied defendant's post-trial motion.

Due to some confusion regarding matters concerning defendant Peasley, two notices of appeal were filed by Admiral. This court allowed the consolidation of those notices; however, only Admiral and Salvator are parties to the instant appeal.

The first issue raised by Admiral on appeal is whether or not Admiral had a duty to defend plaintiff in the action filed against him in Oregon, or a duty to plaintiff to settle the claim in a manner which would have prevented the suspension of plaintiff's license.

■ Defendant first argues that it did not have any duty to defend Salvator in the Oregon suit, and that it owed no duty to plaintiff to pay the default judgment in a manner which would have pre-

vented the suspension of plaintiff's license. Defendant also argues that the only duty it had was to indemnify plaintiff, and that this duty was fulfilled when the judgment was ultimately satisfied. Defendant cites *Oda v. Highway Insurance Co.* (1963), 44 Ill. App. 2d 235, 194 N.E.2d 489, for the proposition that plaintiff had a responsibility to seek legal protection on his own behalf. Defendant further argues that:

> "The sad, but simple truth of this case is that plaintiff bears the real, factual responsibility for his plight. His wrongful assumption that he could sit back and do nothing when he was sued is not even understandable, let alone a basis to mete out $188,450 in damages against Admiral.
>
> A simple telephone call to a competent attorney upon service of the Oregon summons would have avoided all the consequences that befell him. He chose to make that telephone call nine months later and Admiral has been ordered to clean up after plaintiff's own lack of common sense and diligence."

This argument ignores the fact that the amount of damages and Admiral's responsibility for payment of these damages were never in dispute. Even if Salvator had defended himself in the Oregon suit, the evidence in the record strongly indicates that a judgment for substantially the same amount would have been entered against both Salvator and Admiral. There is absolutely no evidence in the record to support defendant's contention that Salvator could have avoided all of the problems which he encountered simply by employing an attorney to defend him in the Oregon suit.

■ Defendant next argues that it was only an indemnitor and not an insurer, and that consequently, it had no duty to defend the Oregon action on behalf of Salvator. Defendant cites *Aetna Casualty & Surety Co. v. Coronet Insurance Co.* (1976), 44 Ill. App. 3d 744, 358 N.E.2d 914, for the proposition that "the duty to defend is broader than the duty to indemnify in an insurance policy situation." Defendant also argues that the duty to defend and the duty to indemnify are "separate and distinct," citing *Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245.

Defendant also relies on *Mortell v. Insurance Co. of North America* (1983), 120 Ill. App. 3d 1016, 458 N.E.2d 922. In *Mortell,* several customers had made claims against certain commodities brokers who had held fidelity bonds issued by Insurance Company of North America. The bonds were to provide indemnity to the brokers for any losses suffered as a result of dishonesty, forgery, theft or the like by the broker's employees. When such claims were made by

customers, the brokers brought a declaratory action which sought the court to determine if the claims were covered by the bonds, the limits of liability, and whether or not the insurance company had violated its duty by not cooperating in the defense of the customers' claims against the brokers. As to this latter contention, the trial court ruled that there was no such duty, and this ruling was sustained on appeal.

Plaintiff argues that the relevant language in the operating agreement, and defendant's status as "self-insured" for the first $25,000 of losses, made Admiral an "insurer." Plaintiff cites *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335, for the proposition that an insurer has a duty to defend the insured against any action which is arguably covered by the policy. (See also *Murphy v. Urso* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079.) Defendant concedes that if it was an insurer, it would have owed Salvator the duty to defend him in the Oregon action. Plaintiff distinguishes *Mortell* on the basis that the instant case involves insurance, whereas *Mortell* involves obligations pursuant to fidelity bonds. Plaintiff also argues that to allow Admiral to provide a different quality of insurance coverage than was contemplated in the operating agreement "would allow an unjust enrichment of the Defendant at the cost of Plaintiff's bargained for rights."

As plaintiff points out in his brief, the damages which Salvator incurred were a result of Admiral's failure to pay the judgment, rather than any failure to defend the action. Neither party could have prevented a judgment from being entered against them, as liability for the accident was never in dispute. Furthermore, it is highly unlikely that defense of the action would have resulted in any reduction in the amount of the judgment. Consequently, we conclude that the arguments and authority cited by the parties regarding the issue of whether Admiral had a duty to defend Salvator in the Oregon suit are not important to a proper resolution of this appeal. Rather, the real issue appears to be whether Admiral had a duty to settle the matter after the default judgment was entered in a manner which would have prevented Salvator's license from being suspended.

Defendant relies upon *Smiley v. Manchester Insurance & Indemnity Co.* (1978), 71 Ill. 2d 306, 375 N.E.2d 118, as support for its contention that it did not breach any duty owed to Salvator by the manner in which they chose to settle the Oregon suit. Defendant asserts that "the very conduct he [plaintiff] complains of has been found nonactionable in *Smiley* ***." *Smiley* involved a lawsuit by an

insurer against an attorney who had negligently failed to transmit settlement offers on the insurer's behalf. The negligence of the attorney resulted in an excess judgment against the insurer. By way of defense at the appellate level, the attorney alleged that a jury could have found that the insurer had been contributorily negligent in failing to settle the claim at an early stage. The court disregarded this assertion and stated:

"The mere fact that an insurer makes a preliminary evaluation of liability based on an adjuster's investigation does not mandate immediate settlement of the claims. *** Under Knight's [the attorney's] theory, an insurer would have a duty to immediately settle a case as soon as it became aware of facts indicating fault. This theory ignores the realities of the settlement and litigation process. In addition to investigating the factual occurrence, both parties mush research the applicable legal principles, ascertain the possibility of success at trial, and determine the nature and extent of damages to a reasonable certainty." *Smiley v. Manchester Insurance & Indemnity Co. of St. Louis* (1978), 71 Ill. 2d 306, 316, 375 N.E.2d 118, 123.

Plaintiff argues that *Smiley* does not control the decision of this case because in the instant case there was no delay in payment of the judgment by reason of a need to investigate, assess success at trial, or determine the extent of damages. Plaintiff notes that those matters had all been resolved well prior to the institution of the Oregon suit, and that by the time suit was instituted there was no question as to the liability or damages. Plaintiff contends that when the default judgment was obtained approximately three months later, there was no reason whatsoever for a delay in the payment of the judgment, but that nevertheless, defendant allowed plaintiff to suffer the consequences of a suspended license so that defendant could attempt to settle the claim at 20% of its fair value. We agree that the rule of law set forth in *Smiley* and relied upon by Admiral is inapplicable to the instant case. The delays in the instant case were clearly not the result of proper business tactics related to the "realities of the settlement and litigation process," but rather were blatant attempts to force Wymore to settle the claim for a small fraction of the amount they were entitled to.

Plaintiff cites *La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 408 N.E.2d 928, as authority for the proposition that an insurer must exercise care and skill to insulate the insured from liability, and that its conduct must be free from bad faith,

fraud or negligence. As the court stated in *La Rotunda*:

"An insurer's duty is not always satisfied by merely paying off whatever the final judgment turns out to be, up to the policy limit, leaving the insured to scrape up the excess. It may not cavalierly gamble with its insured's money. It must exercise care and skill to insulate the insured from liability; its conduct must be free of bad faith, fraud or negligence.

*If an opportunity appears to settle within the policy limits, thereby protecting the insured from excess liability, the insurer must faithfully consider it, giving the insured's interests at least as much respect as its own.* (*General Casualty Co. v. Whipple* (7th Cir. 1964), 328 F.2d 353, 356.) The insurer need not submit to extortion; it may reject a bad deal without waiving the protection the policy limit gives it against the vagaries of lawsuits. But if the honest and prudent course is to settle, the insurer must follow that route. If it deviates from that course, it will be liable for the whole judgment, so as to give the insured the protection that the policy was intended to provide. In cases within the policy limits, the insured was to be held entirely harmless. If the insurer by its own fault converts such a case—one the insurer could have disposed of for a fair sum within the policy limits—into a case beyond the policy limits, the insurer cannot complain of the size of the judgment, a consequence of its own bad faith, fraud or negligence." (Emphasis added.) (87 Ill. App. 3d 446, 454, 408 N.E.2d 928, 935-36.)

We believe that the rule of law set forth in *La Rotunda*, that an insurer must give at least as much respect to the insured's interest as to its own, is applicable to the instant case.

■■ We conclude, based on the record presented to us, that Admiral clearly had a duty to pay the default judgment, and based upon *La Rotunda*, Admiral had a duty to give plaintiff's interest at least as much respect as its own. (See also *Adduci v. Vigilant Insurance Co.* (1981), 98 Ill. App. 3d 472, 424 N.E.2d 645.) Admiral gave no respect to Salvator's position, and wilfully and wantonly allowed plaintiff to suffer severe hardship by refusing to pay an amount it was legally obligated to pay. Admiral's actions in failing to settle the default judgment in a reasonable manner and within a reasonable amount of time, thereby resulting in the loss of plaintiff's license, clearly constituted a breach of duty. Consequently, we conclude that Admiral's argument that it owed no duty to settle the claim in a different manner is without merit.

■ Defendant next argues that even if it breached a duty to plaintiff, the compensatory damages which were awarded for lost wages and medical expenses were not allowable. Defendant's position is that even if it had a duty to defend plaintiff in the Oregon action, its failure to do so would obligate it to pay only those amounts related to the cost of plaintiff's defense and the amount of any judgment made against him. Consequently, because there were no costs of defense, settlement of the Oregon judgment terminated the defendant's obligation to Salvator. Defendant argues that it is therefore not obligated to pay any damages by reason of the fact that it delayed payment of the judgment for a period of approximately 23 months after the default judgment was entered, and 17 months after the suspension of plaintiff's driving privileges.

In support of this argument, defendant cites *Thornton v. Paul* (1978), 74 Ill. 2d 132, 144-45, 384 N.E.2d 335, 340, wherein the supreme court stated:

> "When the insurer wrongfully refuses to defend a complaint which alleges facts within coverage, it is liable to the insured for breach of contract. [Citation.] The measure of damages for such a breach is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred."

Defendant also cites *Associated Indemnity Co. v. Insurance Co. of North America* (1979), 68 Ill. App. 3d 807, 822, 386 N.E.2d 529, 540, and *Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953. Both of these cases contain statements of law similar to the passage from *Thornton* which is quoted above.

Defendant's argument in this regard is premised upon the contention that this was simply a contract action. Plaintiff accurately points out that count III of his complaint, pursuant to which compensatory damages were awarded, stated a cause of action for intentional infliction of emotional distress. Illinois law provides that a plaintiff seeking recovery under the theory of intentional infliction of emotional distress must allege: (1) that the conduct by the defendant was extreme and outrageous; (2) that he has suffered severe emotional harm; (3) that the conduct by the defendant was intentional or so reckless that the defendant knew severe emotional distress was substantially certain to result; and (4) actual and proximate causation of the emotional distress by the defendant's conduct. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 89-90, 360 N.E.2d 765, 767.) As plaintiff points out, an allegation regarding each of the

aforementioned elements is contained in count III of plaintiff's third-amended complaint. Furthermore, as plaintiff points out, actual determinations concerning intentions, recklessness, proximate causation and the extreme and outrageous nature of the conduct of defendant have not been placed in issue on appeal. Instead, the only defense posed by Admiral to the award of compensatory damages is one at law. Defendant specifically states in its brief that:

"No issues are being raised as to credibility of witnesses, the amount of medical expenses claimed, nor the amount of lost wages asserted."

In support of the award of compensatory damages for lost wages pursuant to count I of the complaint, plaintiff cites *Hartford Accident & Indemnity Co. v. Case Foundation Co.* (1973), 10 Ill. App. 3d 115, 124, 294 N.E.2d 7, 14, wherein the court stated:

"Consequential damages mean loss or injury that does not flow directly and immediately from the wrongful act of a party but are the consequences or results of such an act."

Plaintiff notes that the jury made a factual determination that his lost wages were proximately caused by the breach of duty on the part of defendant, and that defendant did not raise any issue with regard to proximate cause. Plaintiff also relies on *Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 790, 387 N.E.2d 700, 710, wherein the court stated:

"[D]amages for a breach of the duty to defend are not inexorably imprisoned within the policy limits, but are measured by the consequences proximately caused by the breach. (*State Farm Mutual Automobile Insurance Co. v. Allstate Insurance Co.* (1970), 9 Cal. App. 3d 508, 88 Cal. Rptr. 246.)"

Plaintiff distinguishes *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335, the case relied on by defendant as authority for limiting plaintiff's damages under counts I and IV of the third-amended complaint. Defendant argues that damages under those counts should be limited to the cost of the defense of the Oregon action together with the amount of that judgment. In *Thornton*, the Illinois Supreme Court decided the issue of whether an insurer was estopped from raising lack of coverage on a claim in a garnishment proceeding because it had failed to defend the insured in the underlying action. In reaching its decision, the court had reason to discuss the measure of damages in such a case. The court stated that "[t]he measure of damages for such a breach is *generally* the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred." (Emphasis added.) (*Thornton v. Paul* (1978),

74 Ill. 2d 132, 145, 384 N.E.2d 335, 340.) Plaintiff points out that the court was not faced with a situation involving consequential damages, and argues that defendant's reliance on this case as a limitation on the damages is unfounded. Plaintiff also distinguishes *Trovillion* and *Associated Indemnity*, two other cases relied on by defendant on this issue, by noting that neither of these two cases involved a prayer for consequential damages; rather, the damage requests were limited to the amount of judgment, costs, and attorneys fees.

Plaintiff also relies on *Morrow v. L. A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 96, 492 N.E.2d 181, 184, wherein the supreme court stated:

"The line of demarcation between tort and contract is sometimes difficult to make, and occasionally, the conduct complained of can constitute both a breach of contract and a tort. (See W. Prosser and W. Keeton, Torts sec. 92, at 655 (5th ed. 1984); Sullivan, *Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change*, 61 Minn. L. Rev. 207, 239.)"

A similar rule of law was set forth in *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 829, 444 N.E.2d 657, 662, wherein the court stated:

"The general rule as to punitive damages is that they are not recoverable in actions for breach of contract. (*St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 420 N.E.2d 478, *appeal denied* (1981), 85 Ill. 2d 575, and the cases cited therein.) This rule does not apply, however, in exceptional cases where the breach amounts to an independent tort and there are proper allegations of malice, wantonness or oppression. (95 Ill. App. 3d 576, 580, citing *Wallace v. Prudential Insurance Co. of America* (1973), 12 Ill. App. 3d 623, 299 N.E.2d 344.)"

Plaintiff concludes his argument on this issue by asserting that "count IV of the third amended complaint was properly pled as an independent tort with proper allegations of malice, wantonness, and oppression."

In its brief, defendant cites *Combs v. Insurance Co.* (1986), 146 Ill. App. 3d 957, 497 N.E.2d 503, for the proposition that a cause of action for intentional infliction of emotional distress cannot be maintained in the instant situation. The precise holding in *Combs* is that section 155 of the Insurance Code (Ill. Rev. Stat. 1977, ch. 73, par. 767) "preempts the field" and precludes a person from filing a com-

mon law complaint for bad faith dealing against an insurance company. The trial court specifically ruled that this provision was inapplicable to the instant case. We do not believe that a person is preempted by that provision when pursuing a cause of action against a party which is not in the business of providing insurance. To hold otherwise under these facts would preclude plaintiff from recovering damages which were caused by defendant's conduct, leaving plaintiff without a remedy. In fact, this court, in *McCall*, extended liability for the common law tort of bad faith dealing to entities normally exempt from coverage under the Insurance Code.

■■ ■ We conclude that plaintiff stated a cause of action for intentional infliction of emotional distress (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765) and for violating the duty to deal in good faith, in addition to stating a cause of action for breach of contract. Consequently, we deem defendant's reliance on *Thornton, Associated Indemnity Co.*, and *Trovillion* to be misplaced. The conduct complained of in the instant case constituted both a breach of contract as well as an independent tort, and there were proper allegations of malice, wantonness, or oppression. (*Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 444 N.E.2d 657; *Morrow v. L. A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 192 N.E.2d 181.) As the court stated in *Reis*, damages in this case are to be measured by the consequences proximately caused by the breach. Proximate cause is not an issue in this case. We therefore conclude that all of the consequential damages awarded to plaintiff were proximately caused by defendant's conduct, and that the award of consequential damages was appropriate. *Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 387 N.E.2d 700; *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 444 N.E.2d 657; *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765; *Morrow v. L.A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 192 N.E.2d 181.

Defendant's final argument is that the imposition of punitive damages pursuant to count IV was error as a matter of law.

Defendant first contends that "it is fundamental that in the absence of compensatory damage, there can be no punitive damages," citing *Ecker v. Big Wheels, Inc.* (1985), 136 Ill. App. 3d 651, 483 N.E.2d 639. This argument is premised upon the assumption that defendant will prevail on issue two of this appeal, and that this court will vacate the award of compensatory damages. Because we have already determined that the award of compensatory damages was proper, we need not address this argument.

■ Defendant next contends that this action was founded in breach of contract, and that no independent tort was pleaded or proved which would support the award of punitive damages. Because we have already determined that plaintiff pleaded an independent tort in addition to the contract claim which is sufficient to support the award of punitive damages it is also unnecessary to address this argument.

As plaintiff points out, the general rule denying punitive damages for breach of contract does not apply in those exceptional cases, such as the case at hand, where the breach amounts to an independent tort and where there are proper allegations of malice, wantonness or oppression. (*Wallace v. Prudential Insurance Co. of America* (1973), 12 Ill. App. 3d 623, 629-30, 299 N.E.2d 344, 349.) As the court stated in *St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 580, 420 N.E.2d 478, 482:

> "It is not so much the tort committed as the motive and conduct in committing it that is the basis of awarding punitive damages."

In order to support the existence of an independent tort, plaintiff need only allege facts which would bring his claim for punitive damages within a recognized tort theory. *Illinois Sterling, Inc. v. KDI Corp.* (1975), 33 Ill. App. 3d 666, 338 N.E.2d 51.

Plaintiff correctly notes that this court, in *McCall v. Health Care Service Corp.* (1983), 117 Ill. App. 3d 107, 452 N.E.2d 893, specifically recognized a common law tort action for bad faith dealing in a case involving insurance. Defendant makes no specific argument regarding plaintiff's contention that a cause of action for the tort of bad faith dealing had been pleaded and proved.

We conclude that the award of punitive damages pursuant to count IV of the complaint, which alleged a cause of action for bad faith dealing, is appropriate. *McCall v. Health Care Service Corp.* (1983), 117 Ill. App. 3d 107, 452 N.E.2d 893; *Illinois Sterling, Inc. v. KDI Corp.* (1975), 33 Ill. App. 3d 666, 338 N.E.2d 51; *Wallace v. Prudential Insurance Co. of America* (1973), 12 Ill.App. 3d 623, 299 N.E.2d 344; *St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 420 N.E.2d 478.

For the reasons stated herein, we hereby affirm the judgment and damage awards of the circuit court of Livingston County.

Affirmed.

LUND and KNECHT, JJ., concur.