GENERAL SECURITY INSURANCE COMPANY (n/k/a Unitrin Auto and Home Insurance Company), et al. Plaintiffs,

v.

JORDAN, COYNE & SAVITS, LLP, et al. Defendants.

No. 1:04CV1436.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 23, 2005.

---

Charles B. Wayne, Piper Rudnick LLP, Washington, DC, for Plaintiffs.

Jeffrey Jerome Hines, Goodell Devries Leech & Dann LLP, Baltimore, MD, John

H. Carstens, Jordan Coyne, Fairfax, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This diversity legal malpractice action is brought by an insurer against a law firm retained to defend an insured in a personal injury lawsuit arising out of an automobile accident. The insurer's claims are brought through the insurer's attorney-in-fact, a former corporate affiliate that assumed the insurer's liability for the underlying personal injury claim. The following potentially dispositive threshold issues are presented:

(i) Does Virginia law permit an insurer to sue a law firm for legal malpractice where, as here, the insurer selected, retained, and paid the law firm to represent its insured, and later alleges that the law firm was professionally negligent in the representation?

(ii) Assuming that an insurer has a legal malpractice claim in such circumstances, does Virginia law permit the claim to be brought, as here, through an attorney-in-fact that has assumed the insurer's liability for the underlying personal injury claim, or does Virginia law regard such an arrangement as a prohibited assignment of a legal malpractice claim?

I.[1]

Of the five named plaintiffs in this action, only two are potential candidates to assert the claims in issue.[2] Plaintiff General Security Indemnity Company of Arizona ("GSINDA") is an Arizona corporation and a wholly-owned subsidiary of SCOR Reinsurance Company, a New York property and casualty insurance company. In November 2004, GSINDA filed this diversity action as the attorney-in-fact of plaintiff General Security Indemnity Company ("GSI"), a New York corporation and former co-subsidiary of SCOR,[3] seeking damages from defendants Jordan, Coyne & Savits LLP ("Jordan Coyne"), a District of Columbia law firm, and Carol T. Stone, a member of Jordan Coyne. Plaintiffs' complaint arises from defendants' allegedly negligent representation of VIP & Celebrity Limousines, Inc. ("VIP"), the holder of a GSI liability insurance policy, in a personal injury lawsuit arising from a two-car automobile accident.

The underlying personal injury lawsuit was filed by Clarissa Scott in December 2000 in the Circuit Court for the City of Norfolk, Virginia. Scott was a passenger in a VIP limousine driven by Anthony Beason, a VIP employee, when the limousine collided with a second car driven by Romeo Dionisio, an unrelated party. De-

---

1. Because this case is presently before the Court on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the facts recited here are derived from the plaintiffs' complaint, memoranda and supporting documents, and representations to the Court at oral argument. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994) (stating plaintiff's version of facts is accepted as true on motion to dismiss).

2. Five plaintiffs were named in the complaint because at the time the complaint was filed, it was unclear which of several affiliated corporate insurers issued the liability insurance

policy pertinent to this lawsuit. This was so because plaintiffs' records were destroyed in the terrorist attacks of September 11, 2001. Subsequent to the filing of this action, plaintiffs have been able to determine that GSI issued the pertinent policy, and thus plaintiffs now argue that GSINDA, GSI's attorney-in-fact, is the proper plaintiff here.

3. SCOR sold all of the outstanding shares of GSI to Odyssey America Reinsurance Company in October 2003. In connection with the sale, GSI changed its name to, and is currently known as, Hudson Specialty Insurance Company.

spite the fact that the police officer investigating the collision reported no injuries, Scott sought damages for bodily injuries sustained in the accident, originally naming VIP, Beason, and Dionisio as defendants in her state court suit. On March 26, 2001, Scott nonsuited her claims against Dionisio,[4] and the following day received a default judgment against VIP as a result of VIP's failure to file a responsive pleading in her case. In April 2001, for reasons not disclosed in the record, the state court dismissed Beason as a defendant when the parties failed to appear at a scheduling conference.

In August 2001, several months after entry of the default judgment and the dismissal of Beason as a defendant, GSI retained Carol Stone and her firm, Jordan Coyne, to defend VIP and Beason in Scott's lawsuit. After reviewing court records, Stone advised GSI that the state court's order dismissing Beason as a defendant had the effect of voiding the default judgment against VIP, and consequently, that the case should be considered closed. Stone did not enter an appearance in the Circuit Court for the City of Norfolk, and took no further action in the matter.

In December 2001, the state court entered an order clarifying that its April 2001 order of dismissal was effective only with respect to Beason, and that Scott's default judgment against VIP therefore remained intact. In May 2002, the state court held a damages trial at which a jury heard evidence of the injuries Scott sustained in the collision. Because Stone had not entered an appearance on VIP's behalf, she was not notified of either the

December 2001 order or the damages trial. Neither VIP nor Stone was present at the damages trial, and thus no defense was presented. Consequently, the jury hearing Scott's case awarded her $500,000 in damages despite the fact that her medical bills from the accident amounted to a mere $2,000. Stone learned of the damages award a few months later, and in September 2002 filed a motion to have both the default judgment and the damages award set aside. The state court denied the motion, stating, "VIP chose to sit on its rights, never again checking the file or making any appearance." *Scott v. Beason*, 62 Va. Cir. 70, 75 (2003). Subsequent efforts to appeal this ruling were unsuccessful.

As the state court's ruling was winding its way through the appellate process, SCOR underwent significant corporate changes, selling off several of its wholly-owned subsidiaries in 2002 and 2003, including GSI. *See supra* note 3. In connection with the sale of GSI, GSI and GSINDA—at SCOR's direction—entered into an agreement whereby GSINDA assumed GSI's liabilities under its existing insurance policies and undertook responsibility for the administration of those policies and any ensuing claims on them. The policy obligations assumed by GSINDA included GSI's liability for Scott's judgment against VIP. Accordingly, when the bill for the judgment came due in February 2004, GSINDA provided the funds for payment.[5] By then, GSI was no longer a SCOR subsidiary and had begun operating under a different name. *See id.*

Approximately one week after Scott's judgment was paid, GSI—now known as

4. *See* Va.Code § 8.01–380 (2004).

5. Because it was only recently established that GSI was the issuer of VIP's policy, *see supra* note 3, the funds used to pay Scott's judgment may not have come from GSINDA.

For present purposes, however, GSINDA is treated as having paid the judgment directly because plaintiffs, forced by 9/11 to do their accounting *nunc pro tunc*, have chosen to proceed on that understanding.

Hudson Specialty Insurance Company—executed a power of attorney granting GSINDA the authority to act in its name for matters pertaining to the administration and servicing of the policy obligations that GSINDA had assumed. Several months later, GSINDA exercised the power of attorney and filed this diversity action on GSI's behalf, asserting claims for breach of contract, legal malpractice, and breach of fiduciary duty against Stone and Jordan Coyne, contending that its liability for the Scott judgment arose from Stone's failure to provide competent legal services to VIP.[6] Defendants have moved to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6), Fed. R.Civ.P. For the reasons that follow, this motion must be granted in part and deferred in part.

## II.

A motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., tests the legal sufficiency of a plaintiff's complaint, and should not be granted unless it appears that the plaintiff can prove no set of facts that would entitle him to relief. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). When reviewing a complaint under Rule 12(b)(6), a court must accept as true all well-pleaded allegations and must construe all factual allegations in the light most favorable to the plaintiff. *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991). Because the purpose of Rule 12(b)(6) is to test a complaint's legal sufficiency, however, a court need not accept the legal conclusions a plaintiff draws from its factual allegations. *Id.*

## III.

Analysis of the parties' positions and contentions properly focuses first on plaintiffs' claims of legal malpractice, for they are the heart and lynchpin of plaintiffs' complaint. In essence, plaintiffs argue that they may sue defendants for legal malpractice in their representation of VIP because GSI selected, retained, and paid defendants to undertake VIP's representation. By these acts, plaintiffs contend, GSI established itself as defendants' client, or, alternatively, as an intended non-client beneficiary of legal services provided to VIP. Defendants counter by arguing that an insurer cannot bring a legal malpractice claim against a law firm it retains to defend an insured because the insured, not the insurer, is the client of the firm, and conflict-of-interest principles bar any secondary duty to the insurer. Defendants also contend that GSI's grant of a power of attorney in GSINDA's favor for the purpose of bringing this lawsuit amounts to a prohibited assignment of GSI's legal malpractice claim.

The first question—whether an insurer can bring a legal malpractice claim against the law firm it retains to defend an insured—has never been squarely addressed by the Supreme Court of Virginia.[7] While

---

6. Plaintiffs' malpractice and breach of fiduciary duty claims each include separate counts for third-party liability. Thus, plaintiff's complaint is formally pleaded in five counts: (i) breach of contract; (ii) legal malpractice; (iii) legal malpractice—third-party liability; (iv) breach of fiduciary duty; and (v) breach of fiduciary duty—third-party liability.

7. Virginia law will apply throughout this case. In diversity cases, a federal district court is

bound to apply the substantive law and choice of law rules of the forum state. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 623–624 (4th Cir.1999) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Because all of plaintiffs' claims arise from defendants' defense of a Virginia lawsuit, Virginia's choice of law rules point to Virginia law as the governing law for plaintiffs' claims, both tort and contract. *See Jones v. R.S. Jones &*

the courts of other jurisdictions generally recognize such a cause of action, they differ markedly on the theory of liability under which such a claim may be brought. In most jurisdictions, the retaining insurer may sue the law firm directly as its client. Although most of the reported cases involving such suits offer no analysis of the insurer's relationship with the law firm,[8] the few that do reflect the view that a "tripartite relationship" exists among insurer, insured, and counsel, with both insurer and insured as co-clients of the firm in the absence of a conflict of interest.[9] *See* RONALD E. MALLEN & JEFFREY M. SMITH, 4 LEGAL MALPRACTICE §§ 29.3, 29.16 (5th ed.2000). Some courts and the Restatement recognize an additional or substitute cause of action by the insurer as a non-client beneficiary of the firm's legal services.[10] Both theories of liability, of course, depend on the existence of a duty of care running from the firm to the retaining insurer, and acknowledge that such a duty disappears when a conflict of interest threatens the firm's ability to represent the insured.[11] Some jurisdictions go one step further, however, and reject outright the idea of a duty owed by the firm the insurer, contending that such a duty would compromise the law firm's loyalty to the insured.[12] Although these rejecting jurisdictions thus preclude any direct legal malpractice liability from the firm to the insurer, they nevertheless permit the insurer to be subrogated to the insured and thus to sue the firm standing in the insured's shoes.[13] Accordingly, despite sharp doctrinal differences regarding the relationship between the insurer and the firm it retains, nearly all jurisdictions in the United States permit some form of

Assocs., 246 Va. 3, 431 S.E.2d 33, 34 (1993) (place of the wrong governs tort claims); *Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.*, 514 F.2d 565, 567 (4th Cir.1975) (place of performance governs questions of breach for contract claims). Additionally, neither party contends that any law other than Virginia's should apply.

8. *See, e.g., Fremont Indem. Co. v. Carey, Dwyer, Eckhart, Mason & Spring, P.A.*, 271 F.3d 1272 (11th Cir.2001) (Florida law); *Reliance Nat'l Indem. Co. v. Jennings*, 189 F.3d 689 (8th Cir.1999) (Arkansas law); *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455 (7th Cir.1996) (Indiana law); *Northwestern Nat'l Ins. Co. v. Osborne*, 573 F.Supp. 1045 (E.D.Ky.1983) (Kentucky law); *Smiley v. Manchester Ins. & Indem. Co.*, 71 Ill.2d 306, 16 Ill.Dec. 487, 375 N.E.2d 118 (1978).

9. *See, e.g., Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1330–31 (9th Cir.1995) (upholding finding of attorney-client relationship between plaintiff insurer and defendant law firm retained to represent insured); *Spratley v. State Farm Mut. Auto. Ins. Co.*, 78 P.3d 603, 607 (Utah 2003); *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 79 Cal.App.4th 114, 93 Cal.Rptr.2d 534, 542–547 (2000); *see also Pine Island Farmers Coop v. Erstad & Riemer,*

P.A., 649 N.W.2d 444, 452 (Minn.2002) (stating that both insurer and insured can be clients of retained firm if no conflict of interest exists and the insured consents after consultation).

10. *See, e.g., Paradigm Ins. Co. v. Langerman Law Offices*, 200 Ariz. 146, 24 P.3d 593, 602 (2001) (holding insurer a non-client beneficiary of firm's legal services); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. g (2000).

11. *See, e.g., Pine Island*, 649 N.W.2d at 452; *Paradigm*, 24 P.3d at 602; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. g (2000).

12. *See Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294, 297 (1991); *Safeway Managing Gen. Agency, Inc. v. Clark & Gamble*, 985 S.W.2d 166, 168 (Tex.App.1998) ("no attorney-client relationship exists between an insurance carrier and the attorney it hires to defend one of the carrier's insureds").

13. *See Bell*, 475 N.W.2d at 297; *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 484 (Tex.1992) (permitting subrogation action against law firm by excess insurer).

legal malpractice action by an insurer against the firm it retains to defend an insured.[14]

The public policy reasons for permitting such an action are obvious, and have been invoked by courts recognizing these aforementioned liability theories. Among other things, permitting an insurer to sue the firm it retains can "promote[ ] enforcement of [the firm's] obligations to the insured," RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. g (2000), because "both insurer and insured often share a common interest in developing and presenting a strong defense to a claim that they believe to be unfounded as to liability, damages, or both." *Paradigm*, 24 P.3d at 598. Because the insurer rather than the insured is typically required to satisfy a judgment resulting from the firm's negligence, the insured rarely has any incentive to bring a claim for malpractice against the retained firm. *See .Bell*, 475 N.W.2d at 297. The failure to recognize a cause of action by the insurer, therefore, serves the interests of no one except the entity that committed the malpractice. *See id.* at 298. Permitting the insurer to sue the firm, moreover, comports more readily with the understanding among both lawyers and insurers that the "the lawyer's services are ordinarily intended to benefit both the insurer and the insured when their interests coincide." *Paradigm*, 24 P.3d at 602. Accordingly, despite the fact that "the tripartite relationship between insured, insurer, and defense counsel contains rife possibility of conflict," *see Bell*, 475 N.W.2d at 297, nearly all courts have concluded that the harms-benefits calculus weighs in favor of recognizing an insurer's legal malpractice claim against the lawyer or law firm it retains to represent an insured.

■ Here, plaintiffs have not asserted a subrogation-based claim for legal malpractice.[15] Instead, as previously stated, plaintiffs' legal malpractice claims are premised on the theory that defendants owed a duty of care directly to GSI because GSI was either a client of defendants or a non-client beneficiary of defendants' legal services. In this regard, the Supreme Court of Virginia has never suggested that an insurer, as well as the insured, may be a client of the law firm the insurer retains to defend an insured. The judicial tea leaves, such as they are, suggest the contrary. Thus, Virginia State Bar ethics opinions, approved by the Supreme Court of Virginia, make unmistakably clear that an insurer is not the client of counsel it retains to defend an insured.[16] In these circumstances, it appears unlikely that Virginia would embrace the insurer-as-client theory.

---

14. Not addressed here are the cases cited by defendant denying legal malpractice claims by excess insurers rather than, as here, a primary insurer. *See, e.g., Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103 (2d Cir.1991); *Essex Ins. Co. v. Tyler*, 309 F.Supp.2d 1270 (D.Colo.2004). Also not addressed are cases, inapposite here, in which the defendant attorneys were retained by the insured rather than, as here, the insurer. *See, e.g., Nat'l Union Fire Ins. Co. v. Salter*, 717 So.2d 141 (Fla. 5th DCA 1998).

15. Although plaintiffs have not raised the issue, it is highly unlikely they would be permitted to proceed with a subrogation-based claim under Virginia law. As will be discussed below, Virginia law does not permit the voluntary assignment of legal malpractice claims, *MNC Credit Corp. v. Sickels*, 255 Va. 314, 497 S.E.2d 331 (1998), and the public policy concerns underlying this rule apply with equal force in the context of involuntary assignments, *i.e.*, subrogation. *See New Hampshire Ins. Co. v. McCann*, 429 Mass. 202, 707 N.E.2d 332, 335 n. 4 (1999); *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg*, 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424, 430 (1994). *But compare Bell*, 475 N.W.2d at 297 (permitting subrogation of legal malpractice claim), *with Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736 (1983) (barring assignment of legal malpractice claim in same jurisdiction).

16. *See* Virginia State Bar Standing Committee on Legal Ethics, Opinion 598 (approved by Supreme Court of Virginia, 1985) ("the client of an insurance carrier's employee attorney is the insured, not the insurance carri-

■ Significantly, the Restatement rule permitting insurers to sue is not premised on recognizing the insurer as a client. Instead, the Restatement teaches that a lawyer owes an actionable duty of care to a non-client when:

(a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the non-client;

(b) such duty would not significantly impair the lawyer's performance of obligations to the client; and

(c) the absence of such a duty would make enforcement of those obligations to the client unlikely ....

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51(c) (2000). Comment (g) to this provision explains its applicability in the insurance-defense context: "a lawyer designated by an insurer to defend an insured owes a duty of care to the insurer with respect to matters as to which the interests of the insurer and insured are not in conflict, whether or not the insurer is held to be a co-client of the lawyer ...."

*Id.* at cmt. g. Other jurisdictions have sensibly acknowledged the merits of the Restatement's teaching and incorporated this theory of liability into governing law.[17] Although the Supreme Court of Virginia has not yet addressed this issue, it has recognized an attorney's liability to non-clients in other contexts, *see Copenhaver v. Rogers*, 238 Va. 361, 384 S.E.2d 593 (1989) (will beneficiary), and therefore, given the widely-accepted public policy reasons for permitting an insurer to sue its insurance defense counsel for malpractice, it is likely to do so here as well.[18] Accordingly, defendants' argument that plaintiffs have no claim for legal malpractice because GSI was not defendants' client must fail.

## IV.

■ Defendants' second argument—that GSI's grant of a power of attorney to GSINDA constitutes an assignment of GSI's legal malpractice claim—stands on a different footing; there is controlling state law authority on this point. In Virginia as in most other jurisdictions, a claim for legal malpractice is not assignable. *MNC Credit Corporation v. Sickels*, 255 Va. 314, 497 S.E.2d 331 (1998).[19] In *Sickels*, the

---

er"); *see also* Opinion 1536 (1993) (stating that insurer is not a client of insurance defense counsel, and that counsel may therefore sue a party insured by the same insurer in later action without a conflict of interest).

**17.** *See supra* note 10.

**18.** This conclusion is not cavalierly reached. Indeed, where, as here, a federal court must divine what a state's highest court would write on a particular *tabula rasa*, the federal court must act with great caution, as only the state's highest court is the final and authoritative source of state law. In relatively rare cases, where the record is fully developed, the novel issue is unavoidable, and the relevant legal landscape in Virginia and elsewhere is devoid of any guidance, a reference to the state's highest court may be appropriate. *See* RULE 5:42, RULES OF SUPREME COURT OF VIRGINIA (2004). This extraordinary course of action

seems unnecessary here, as there are sufficient clues in the case law of Virginia and other jurisdictions to permit the reasonably confident conclusion that the Supreme Court of Virginia would recognize an insurer's legal malpractice cause of action on the Restatement theory.

**19.** For examples of cases from other jurisdictions holding legal malpractice claims unassignable, see *Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114, 118 (1984); *Goodley v. Wank & Wank*, 62 Cal.App.3d 389, 133 Cal. Rptr. 83, 87 (1976); *Roberts v. Holland & Hart*, 857 P.2d 492, 495 (Colo.Ct.App.1993); *Washington v. Fireman's Fund Ins. Co.*, 459 So.2d 1148, 1148–49 (Fla.Dist.Ct.App.1984); *Brocato v. Prairie State Farmers Ins. Assoc.*, 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200, 1201–02 (1988); *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 343–44 (Ind.1991);

case establishing the rule of non-assignability, the legal malpractice claims in issue had been assigned to the plaintiff corporation by a sister subsidiary corporation pursuant to an asset purchase agreement. *See id.* at 332 n. 1. The sister corporation, not the plaintiff, had once been the client of the *Sickels* defendants. *See id.* at 332. Holding that the common-law prohibition on such an assignment had not been altered by statute,[20] the Supreme Court of Virginia noted the public policy concerns underlying the common-law rule, particularly the preservation of the "highly confidential and fiduciary relationship between an attorney and client." *Id.* at 333. The Supreme Court of Virginia also quoted extensively from the seminal case of *Goodley v. Wank & Wank,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 87 (1976), which explained that permitting assignments of legal malpractice claims would lead to the undesirable "merchandizing" of such claims, and thus "encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers." Given these hazards, the Supreme Court of Virginia concluded that "the common law rule which prohibits the assignment of legal malpractice claims safeguards the attorney-client relationship which is an indispensable component of our adversarial system of justice." *Sickels,* 497 S.E.2d at 334.

■ Yet, the analysis here does not end with *Sickels* because the instant case, unlike *Sickels,* does not involve an explicit, formal assignment. Although there was no dispute in *Sickels* that the plaintiff was attempting to bring its claims as an assignee, courts in Virginia and elsewhere have held that the policy concerns discussed in *Sickels* and *Goodley* are offended in circumstances where a formal assignment[21] has been avoided but the true plaintiff-in-interest is someone other than the defendant-attorney's former client. In *Weiss v. Leatherberry,* 863 So.2d 368 (Fla. 1st DCA 2003), for example, a Florida appellate court considered a legal malpractice claim brought by a client-plaintiff who had entered into an agreement with a non-client third party granting the third party both the power to direct the litigation and the right to retain any damages recovered.[22] The court in *Weiss* held that such an agreement had "the same effect" as a formal assignment, and thus that "the cause of action asserted under the agreement [could] not be maintained." *Id.* at 372–73. Importantly, however, the court did not order that the case be dismissed outright, reasoning that the invalid agreement had no effect on the merits of the plaintiff's legal malpractice claim, "assuming the claim is asserted by the proper person."

*Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155, 157 (Ky.Ct.App.1988).

20. The specific issue in *Sickels* was whether Va.Code § 8.01–26, which states that "causes of action *ex contractu* are assignable," applied to legal malpractice claims. Noting the public policy concerns discussed above, the Supreme Court of Virginia held that it did not. *Sickels,* 497 S.E.2d at 333.

21. An assignment is a voluntary transfer of property or some other right that confers a complete and present right in the subject matter to the assignee. *See* 6 AM. JUR. 2D *Assignments* § 1–2 (1999); *Edmunds v. CBC Enters., Inc.,* 261 Va. 432, 544 S.E.2d 324, 326–27 (2001).

22. The third party in *Weiss* had won a judgment against the *Weiss* plaintiff in the litigation giving rise to the *Weiss* plaintiff's legal malpractice claim. *See Weiss,* 863 So.2d at 370. The *Weiss* plaintiff's agreement to let the third party direct the malpractice lawsuit and keep any proceeds therefrom was consideration for the third party's agreement to forgo collecting on its judgment. *See id.*

*Id.* at 373. Thus, the court remanded the case to the trial court with directions to determine whether the plaintiff would prosecute his claim independently of the agreement or simply dismiss it. *Id.* Identical reasoning was applied in *Tate v. Goins, Underkofler, Crawford & Langdon,* 24 S.W.3d 627 (Tex.App.2000), in which a Texas appellate court held that a similar agreement between a client-plaintiff and a third party "demonstrate[d] the same evils" as an assignment and was thus invalid, but reversed the grant of summary judgment for the defendants to permit the plaintiff to continue the lawsuit to the extent that he was actually the real party in interest. *Id.* at 634, 637.[23]

A slightly different result obtained in *American Recovery Corp. v. Fox,* 52 Va. Cir. 87 (2000), in which the Circuit Court for Fairfax County, Virginia granted summary judgment against a plaintiff corporation bringing a legal malpractice claim against its former counsel. As in *Weiss* and *Tate,* the plaintiff in *Fox* had entered into an agreement granting certain third parties a percentage of any damages recovered. *See id.* at 90–91. Concluding that this agreement was "in substance and effect" an assignment of the plaintiff's legal malpractice claim, the court held the agreement invalid under *Sickels. See id.* at 96. Unlike in *Weiss* and *Tate,* however, the court dismissed the case outright instead of granting the plaintiff the option to proceed with its claim independently of the agreement. *See id.* at 97.

 The principles set forth in these cases compel the conclusion that GSI's grant of a power of attorney in GSINDA's favor for the purpose of bringing this lawsuit amounts to an impermissible assignment of GSI's legal malpractice claim

against defendants. The facts as stated in the complaint reflect that GSINDA assumed GSI's liability for the judgment giving rise to GSI's claim for malpractice. In this regard, GSINDA is the real party in interest here as it is the only plaintiff with losses to recoup. The fact that GSINDA brings this lawsuit through a power of attorney instead of an assignment appears particularly irrelevant when one considers the long history of the power of attorney as a device to avoid the common-law prohibition on the assignment of choses in action. *See* 4 Corbin on Contracts § 856 (2004) (noting the early use of the power of attorney "to enforce [a chose in action] in the name of the owner and to keep the proceeds so obtained."). Permitting GSINDA to pursue this action, therefore, would run afoul of the concerns articulated in *Goodley* and adopted in *Sickels,* namely the trading of legal malpractice claims and the subjection of attorneys to negligence actions by strangers to the attorney-client relationship. For these reasons, GSINDA cannot be permitted to pursue this action, and must therefore be dismissed as a plaintiff.

Seeking to avoid this result, plaintiffs contend that *Richter v. Analex Corp.,* 940 F.Supp. 353 (D.D.C.1996), permits a "successor corporation" to pursue an assigned legal malpractice claim in certain circumstances. In *Richter,* the defendant Analex Corporation brought a counterclaim for legal malpractice against an attorney that had previously served as counsel to Xanalex, a separate corporation. *Id.* at 355. As the basis for its counterclaim, Analex claimed that it had acquired Xanalex's legal malpractice claim through an asset purchase, and noted also that it had assumed financial responsibility for the crim-

---

**23.** One difference between *Tate* and *Weiss* was the fact that the plaintiff in *Tate* retained the right to a small percentage of the damages recovered under the agreement in issue,

whereas the *Weiss* plaintiff had given up any right to a share of the damages. *See Weiss,* 863 So.2d at 370; *Tate,* 24 S.W.3d at 633.

inal fines resulting from the attorney's alleged malpractice. *Id.* at 355–56. Given these facts, the district court for the District of Columbia held that Analex could not bring its counterclaim on a corporate-successor theory because Xanalex continued to exist as a functioning entity. *Id.* at 356. The district court also held, however, that Analex could bring its claim on an assignment theory because the public policy concerns discussed in *Goodley* would not be offended in the circumstances of the case. *Id.* at 357–58 n. 4. In reaching this result, the court reasoned that:

> plaintiff was the attorney for the predecessor corporation whose liabilities now burden defendant. The legal malpractice claim was not bartered or sold to an unrelated third party; indeed, Analex argues that its liabilities, assumed from Xanalex, arose directly out of plaintiff's conduct. Moreover, the interests are purely pecuniary in nature and do not implicate the kinds of concerns raised by the sale or assignment of a personal injury claim.

*Id.* at 358. On this basis, the district court in *Richter* concluded that District of Columbia law would not bar the assignment of Xanalex's claim for legal malpractice. *See id.*

The short answer to plaintiffs' argument that *Richter* defeats the present motion to dismiss is that *Richter* is not the law in Virginia. The facts in *Sickels* were remarkably similar to those in *Richter*, yet the Supreme Court of Virginia, without citing *Richter*, unequivocally held in *Sickels* that the legal malpractice claim in issue in that case could not be assigned. *Sickels*, 497 S.E.2d at 333. In *Sickels* as in *Richter*, the purported assignment oc-

curred between related corporations in connection with an asset purchase, and thus the concerns addressed in *Goodley* regarding the merchandizing of legal malpractice claims were not prominent in *Sickels* either. *See id.* at 332. Additionally, the interests at stake in *Sickels* were "purely pecuniary in nature," just as they were in *Richter* and as is generally the case with legal malpractice claims. *See Richter*, 940 F.Supp. at 357 (citing *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357, 359 (1988)). The only apparent difference between *Richter* and *Sickels*, in fact, is that *Richter* expressly mentions that the assignee corporation assumed the assignor's liabilities resulting from the alleged legal malpractice. *Id.* at 358. It is unclear what legal significance this fact has outside of the context of subrogation, however, and in any event, nothing in *Sickels* suggests that the Supreme Court of Virginia would have decided *Sickels* differently had the purported assignee of the legal malpractice claim in issue absorbed the purported assignor's losses giving rise to the claim. In short, it can be reliably inferred from *Sickels* that the Supreme Court of Virginia has adopted a bright-line rule against the assignment of legal malpractice claims.[24] Accordingly, plaintiffs' argument that *Richter* permits their legal malpractice claims to proceed is unpersuasive.

▆▆▆ What, then, of GSINDA's other claims, *i.e.*, breach of contract and breach of fiduciary duty? These claims are also barred by *Sickels* because they are mere disguises for plaintiffs' legal malpractice claims: The breach alleged in both the breach of contract and breach of fiduciary duty claims is the same failure to provide

---

24. *Cf. Rosby Corp. v. Townsend, Yosha, Cline & Price*, 800 N.E.2d 661, 666 (Ind.App.2003). In *Rosby*, an Indiana appellate court concluded that *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338 (Ind.1991), a case cited with approval in

*Sickels*, "bars the assignment of *all* legal malpractice claims," *i.e.*, without regard to whether the *Goodley* factors were present in the specific circumstances. *Rosby*, 800 N.E.2d at 666 (emphasis added).

adequate legal services that is the crux of the legal malpractice claims. Virginia law recognizes that claims for legal malpractice contain elements of both tort and contract law, and categorizes them within the rubric of contract claims. *Oleyar v. Kerr,* 217 Va. 88, 225 S.E.2d 398, 400 (1976) ("an action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract"). Under Virginia law, therefore, plaintiffs' breach of contract claim is not separate from their claims for legal malpractice, but is simply a restatement of the same cause of action. By the same token, plaintiffs' breach of fiduciary duty claims are also redundant to their legal malpractice claims because they arise from the same contract. *See O'Connell v. Bean,* 263 Va. 176, 556 S.E.2d 741, 743 (2002) ("[The plaintiff's] assertions of breaches of fiduciary duty ... are actions for breaches of the implied terms of [the attorney-client] contract."). Moreover, courts of other jurisdictions uniformly agree that the principles governing legal malpractice claims are unaffected by the form of action pleaded. *See, e.g., Am. Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1459 (7th Cir.1996) ("Given that the alleged "breach" complained of is the failure to adhere to the appropriate standard of [attorney] care, there is no difference between the [plaintiff's] tort and breach of contract claims."); *FDIC v. Clark,* 768 F.Supp. 1402, 1410–11 (D.Colo.1989), *aff'd* 978 F.2d 1541 (10th Cir.1992) ("[E]ven in jurisdictions where a separate contract claim for [legal malpractice] has been recognized, the claim ... may not be raised as a means of sidestepping the limitations placed on tort actions."). As one important commentator has recognized, "No matter how the undertaking to exercise ordinary skill and knowledge is characterized, the essential claim is for legal malpractice." *See* Mallen & Smith, 1 Legal Malpractice § 8.1, at 769–70. According-

ly, all counts of plaintiffs' complaint suffer the same fate under *Sickels,* whether pleaded as legal malpractice, breach of contract, or breach of fiduciary duty claims.

For the reasons stated herein, only GSI may assert a legal malpractice claim against defendants. Yet, it appears from the record that GSINDA, not GSI, paid the judgment giving rise to the claim, and if so, it follows that GSI suffered no loss as a result of the alleged legal malpractice, and that its claim should also be dismissed. Accordingly, it is appropriate to require that GSI file a pleading setting forth whether it has suffered any loss as a result of the alleged legal malpractice, and if not, any reason why its claim against defendants should not be dismissed.

An appropriate order will issue.